156

John W. MATHEWS; Carole Ann Nuckton; Patricia Lester; Jordan Brodsky; Thomas C. Chestney; Deborah W. Troemner; William J. Waterman, Jr.; Vernon L. Schatz; Melvin H. Roots; Robert J. Holton; James J. Boyle; David L. Robinson; Vincent J. Panepinto; Dominic A. Martell; Francis B. Borcato; John J. Dougherty, Trustees of the Operative Plasterers & Cement Masons Local Union Officer & Employee Pension Fund; Lee Crossman; Susanne Diane Anderson; Larry C. Anderson; George P. Arnold; Ann M. Arnold; Donald J. Aibel, on behalf of themselves and all others similarly situated,

v.

KIDDER, PEABODY & CO., INC., a Delaware corporation; KP Realty Advisers, a Delaware corporation; HSM, Inc., a Texas corporation; Henry S. Miller Co., Henry S. Miller Management; Henry S. Miller Appraisal Corporation; HSM Real Estate Securities Corporation; Miller Real Estate Services Corporation, a Texas corporation, Appellants.

No. 97–3164.

United States Court of Appeals, Third Circuit.

Argued June 11, 1998.

Decided Nov. 16, 1998.

David A. Brownlee (argued), Kenneth M. Argentieri, Paul E. Del Vecchio, Bethany E. Ammons, Kirkpatrick & Lockhart, LLP, Pittsburgh, PA, for Appellants, Kidder, Peabody & Co., Incorporated and KP Realty Advisers, Inc.

William M. Wycoff, Donald M. Lund, Thorp, Reed & Armstrong, Pittsburgh, PA, for Appellants, HSM, Inc., Henry S. Miller Co., Inc.; Henry S. Miller Management Corporation; Henry S. Miller Appraisal Corporation; HSM Real Estate Securities Corporation and Miller Real Estate Services Corporation.

Anthony P. Picadio (argued), Picadio, McCall, Kane & Norton, Thomas W. Henderson, Tybe A. Brett, Pittsburgh, PA, for Appellees.

Before: BECKER, Chief Judge, and ALDISERT and WEIS, Circuit Judges.

## OPINION OF THE COURT

BECKER, Chief Judge.

 The Private Securities Litigation Reform Act of 1995 ("Reform Act" or "PSLRA"), amends 18 U.S.C. § 1964(c) to eliminate, as a predicate act for a private cause of action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), any conduct actionable as fraud in the purchase or sale of securities. *See* Pub.L. No. 104–67, § 107, 109 Stat. 737, 758. This civil RICO case was brought by plaintiff John W. Mathews ("Mathews"), a disappointed investor, alleging misconduct—including securities fraud—by several investment houses in connection with the sale of limited partnerships in real estate. The question presented in this interlocutory appeal by Kidder, Peabody & Co. and the other defendants is whether the relevant portion of the Reform Act (hereinafter the "RICO Amendment") applies retrospectively to eliminate securities fraud-based RICO claims such as the present one, which were pending when Congress enacted the Reform Act. The defendants argue that it does. We hold that it does not.[1]

### I. Facts and Procedural History

This action arises out of Mathews's failed investment in one of three related real estate limited partnerships—KP/Miller Realty Growth Fund I, L.P. ("Fund I"); KP/Miller

---

1. A separate issue briefed and argued by the parties is whether the Reform Act applies to and bars the securities fraud-based RICO claims of certain individuals who were added to plaintiff's original action in his First Amended Complaint *after* Congress enacted the Reform Act. We conclude, however, that the issue is not properly before us in this interlocutory appeal. Our jurisdiction pursuant to 28 U.S.C. § 1292(b) is limited to the certified order; we do not have authority to review other orders that may have been entered in the case. *See United States v. Stanley,* 483 U.S. 669, 676–77, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987). Since to determine this issue we would have to decide whether the origi-

nal plaintiff had standing to represent the new classes of plaintiffs added in the First Amended Complaint and whether the district court properly granted Mathews's class certification motion— two issues that were not included in or subsumed by the certified order—we are barred from reviewing it. While we may reach other issues not before us when necessary "[t]o give full effect to the appellants' right to review," *Georgine v. Amchem Prods., Inc.,* 83 F.3d 610, 624 (3d Cir. 1996), *aff'd sub nom. Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), we can fully review the issue decided in the certified order without reaching these other issues.

Realty Growth Fund II, L.P. ("Fund II"); and KP/Miller Realty Growth Fund III, L.P. ("Fund III")—organized, marketed, and managed by the defendants in the 1980s.[2] On June 7, 1984, Mathews purchased 40 units of Fund II from the defendants for $500 per unit, representing a total investment of $20,-000. Almost eleven years later, on January 23, 1995, Mathews filed a class action complaint against the defendants to recover his losses and the losses of a putative class of persons who purchased partnership units in all three Funds. The complaint asserted federal RICO claims and state claims for breach of fiduciary duty and negligent misrepresentation.

Mathews alleges that the defendants organized the Funds for the purported purpose of making sound investments in commercial real estate projects in the United States, but that the true purpose of the Funds, and the object of the defendants' fraudulent scheme, was to generate excessive fees and income for the defendants who sponsored the Funds. Mathews further alleges that the defendants engaged in the predicate acts of securities fraud, mail fraud, and wire fraud in the organization, marketing, and management of these Funds and that this constituted a cognizable pattern of racketeering activity.[3] The factual predicates for Mathews's theory are as follows.

First, he alleges that Kidder, using interstate wire communications, advised its retail brokers in branch offices around the country that units in the Funds were available for sale, but (mis)represented that they were safe, nonspeculative investments, suitable for customers with conservative investment objectives and a low tolerance for risk. Further, in light of Kidder's characterization of the Funds, the brokers between 1982 and 1986 made an "oral uniform sales pitch" to

more than 6,000 potential investors in the Funds, who purchased units in the Funds in reliance on these misrepresentations. Mathews alleges that defendants "concealed the true value of the investments" and "deliberately misrepresented the value of these investments on monthly account statements" that were mailed to investors. These misrepresentations allegedly continued until February 1, 1994, when Kidder purportedly sent account statements to investors that, for the first time, "alerted investors that the value of the KP–Miller partnerships may have depreciated."

Mathews asserted RICO claims with respect to all three Funds, although he had only invested in Fund II, seeking to represent "a class of persons which includes all persons residing in the United States who purchased partnership units in KP/Miller Realty Growth Funds I, II, and III in the initial offering of such securities." The defendants moved to dismiss the complaint, contending, *inter alia,* that Mathews had no standing to assert claims as to Funds I and III in which he had never invested, and that his claims were barred by the statutes of limitations applicable to securities claims and RICO claims. On December 19, 1995, the district court held that Mathews could pursue his claims with respect to Fund II, but dismissed his individual claims with respect to Funds I and III, concluding that Mathews lacked standing to bring them. *See* Dist. Ct. Op. & Order (Dec. 19, 1995) at 13–16. The court reserved judgment on whether Mathews could serve as a class representative for the class of persons who invested in all three of the Funds. *See id.* at 13–14 n. 4.

Three days after this Order, on December 22, 1995, the Reform Act became law when the Senate overrode President Clinton's veto.

---

**2.** There are two groups of related defendants. The "Kidder Defendants" include Kidder, Peabody & Co. Inc., the principal distributor for the KP/Miller Funds offerings and the corporate parent of KP Realty Advisers, Inc.; and KP Realty Advisers, Inc., a corporate general partner of the KP/Miller Funds. The second group, the "Miller Defendants," include Miller Real Estate Services Corp., a corporate general partner of the KP/Miller Funds; HSM, Inc.; Henry S. Miller Co.; Henry S. Miller Management Corp.; Henry S. Miller Appraisal Corp.; and HSM Real Estate

Securities Corp. Collectively, we refer to these entities as the "defendants."

**3.** Our conclusions regarding Mathews's securities fraud-based RICO claims apply to his mail and wire fraud-based claims, as the latter "are based on conduct that would have been actionable as securities fraud." H.R. Conf. Rep. No. 104–369, at 47 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 746.

*See* 141 Cong. Rec. S19180 (daily ed. Dec. 22, 1995). As noted above, the Act forecloses civil RICO claims that are based upon conduct that would have been actionable as securities fraud. *See* Pub.L. No. 104–67, § 107, 109 Stat. 737, 758 (1995) (amending 18 U.S.C. § 1964(c) (1994)). After passage of the Act and the district court's dismissal of Mathews's individual Funds I- and III-based causes of action, Mathews sought leave to file a First Amended Class Action Complaint. He sought to add twelve new plaintiffs who had invested in Funds I or III, or both. The defendants opposed the motion on the ground that the Reform Act should apply retrospectively to Mathews's action.

That same day, Mathews moved for class action determination, requesting certification of a class embracing investors in Funds I, II, and III, and designation of Mathews as class representative. The defendants opposed the Class Certification Motion arguing, *inter alia,* that Mathews could not satisfy the typicality requirement of Rule 23(a): (1) with respect to a class of investors in Funds I and III since he had no standing to pursue such claims, and (2) because he was subject to particularized defenses on his Fund II claims since he had transferred his Fund II investment out of Kidder in May 1987 and had not received the account statements that he claimed were the basis for the alleged misrepresentations underlying his RICO claim. In addition, defendants contended that Mathews could not satisfy the predominance requirement of Rule 23(b)(3) because his RICO claims were grounded on oral representations by a multitude of brokers that would require highly individualized showings of broker representations and customer reliance.

The district court rejected most of defendants' arguments and granted both of Mathews's motions. First, in an unpublished opinion and order, the court granted the Class Certification Motion, concluding that Mathews had met his burden of establishing the requirements of Rule 23 for class certification. *See Mathews v. Kidder, Peabody & Co.,* No. 95–85, 1996 WL 665729, at *5 (W.D.Pa. Sept.26, 1996). Simultaneously, the court filed an opinion in which it held that the Reform Act did not retrospectively bar

Mathews's previously filed RICO claims that otherwise would be proscribed under the amended RICO Act. *See Mathews v. Kidder, Peabody & Co.,* 947 F.Supp. 180, 185–86 (W.D.Pa.1996). The court also ruled that Mathews could file the Proposed First Amended Complaint adding the new plaintiffs, because the class-action RICO claims relating to Funds I and III had not previously been dismissed and were likewise not barred by the Reform Act. *See id.* at 187–89.

Recognizing that the defendants' position on the retrospective application of the Reform Act presented a serious issue, the district court certified an interlocutory appeal from the opinion and order, regarding the application of the Reform Act to this case. *See* Dist. Ct. Modified Order (Jan. 22, 1997). We granted defendants' petition for permission to appeal. *See* 28 U.S.C. § 1292(b).

## II. Retrospective Application of Statutes Under *Landgraf* and *Lindh*

The defendants contend that the district court erred when it refused to apply the Reform Act retrospectively to bar Mathews's pending RICO claims, which were based upon allegations of securities fraud. The relevant section of the Reform Act, section 107, provides that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of [RICO]." Defendants base their argument on a reading of *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), and *Lindh v. Murphy,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), the preeminent recent cases addressing the retrospective application of statutes.

### A. *Landgraf*

In *Landgraf,* the Court set out a two-step analysis for considering the temporal reach of new federal statutes:

> When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the

statute contains no such express command, the court must determine whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

*Landgraf*, 511 U.S. at 280, 114 S.Ct. 1483. Under the two-step analysis, a court must first ask a threshold question: has Congress expressly provided that the statute in question should or should not apply retrospectively? If the answer to this question is "yes," then we follow Congress' express prescription and apply the statute accordingly.[4] If the answer to this question is "no," then we move on to the second step in the analysis.

■ The second step requires us to ask whether the statute has a "retroactive effect."[5] If the answer to this question is "yes," there is a traditional, strong presumption against retrospective application. Thus, we ask a subsidiary question: Is there a "clear congressional intent" to apply the statute retrospectively? If the answer to this question is "yes," then Congress's clear intent trumps the default presumption, and we apply the statute retrospectively. Otherwise, if this clear intent to apply the statute retrospectively is absent, the default rule applies, and we do not apply the statute retrospectively. If, on the other hand, the answer to the second question—does the statute have "retroactive effect"?—is "no," courts are to use normal rules of statutory construction along with traditional methods of determin-

ing a statute's temporal reach to establish whether a statute is to be applied retrospectively.[6]

### B. *Lindh*

In 1997, the Supreme Court added a new twist to the *Landgraf* two-part analysis:

> In determining whether a statute's terms would produce a retroactive effect, however, and in determining a statute's temporal reach generally, our normal rules of construction apply. Although *Landgraf*'s default rule would deny application when a retroactive effect would otherwise result, *other construction rules may apply to remove even the possibility of retroactivity* . . . .

*Lindh*, 117 S.Ct. at 2063 (emphasis added). This language reforms the two-part analysis we sketched above, essentially adding a step. *Lindh* directs us to ask an additional threshold question before we move to the question of whether the statute has a retroactive effect. Under *Lindh*'s modification to the *Landgraf* two-part inquiry, the analysis is as follows: First, we ask the same threshold question: did Congress expressly prescribe the statute's temporal reach? Of course, if the answer to this question is "yes," then we follow Congress's express prescription and apply the statute accordingly. However, if the answer is "no," then we ask another threshold question before moving to the "retroactive effect" inquiry—do the normal rules of statutory construction apply in such a way as to remove the possibility of retroactivity?

In *Lindh*, the Court used a negative inference to infer that Congress did not intend to apply retrospectively certain parts of the Antiterrorism and Effective Death Penalty Act

---

**4.** Of course, a court may not follow an express command to apply a statute to pending cases if to do so would violate a constitutional proscription, such as those found in the Ex Post Facto or Due Process Clauses.

**5.** "Retroactive effect" refers not to a statute's temporal reach—which is the ultimate question to be answered in these cases—but to the effect the statute would have if applied retrospectively; i.e., would it reach back in time and alter the rights or obligations on which the parties relied prior to the statute's passage? If so, the statute is said to have "retroactive effect" and, as dis-

cussed in the text, its application to pending cases is disfavored. To minimize confusion, we refer to a statute that applies to pending cases as one with "retrospective" application.

**6.** Although it was not necessary for the Court in *Landgraf* to reach this final point in the analysis—for it found that the provisions involved had a retroactive effect—language in *Landgraf* and later cases, discussed below in the text, make clear that a statute without retroactive effect and without an express temporal command are subject to normal rules of statutory construction.

of 1996 ("AEDPA"). *See Lindh,* 117 S.Ct. at 2063–64. Thus, the Supreme Court held that if a congressional intent to *not* apply a statute retrospectively can be discerned, then the courts are to follow that intent, without regard to whether the statute has "retroactive effect." Underlying this new step in the analysis was the traditional presumption against retroactivity. *See Lindh,* 117 S.Ct. at 2062; *see also Hughes Aircraft Co. v. United States ex rel. Schumer,* 520 U.S. 939, 117 S.Ct. 1871, 1876, 138 L.Ed.2d 135 (1997).

### C. The *Landgraf/Lindh* Framework

■ The resulting *Landgraf/Lindh* analysis can be summarized as follows:

1. First, we must look for an "unambiguous directive," *Landgraf,* 511 U.S. at 263, 114 S.Ct. 1483, from Congress as to the temporal reach of a statute. If one is found, we must follow it and our inquiry is done.

2. In the absence of a clear statement from Congress, we must use normal statutory construction rules to determine if Congress manifested an intent to only apply a statute to future cases. Again, if we find an intent to not apply a statute retrospectively, our inquiry is done.[7]

3. If neither an express command in either direction nor an intent to apply a statute prospectively is found, we look at the effect that the statute will have. Does it have "retroactive effect," i.e., does it "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to . transactions already completed"? *Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483. Or, conversely, does the statute affect only prospective relief, or change procedural rules,[8] or simply allocate jurisdiction among fora?

a. If the statute does *not* have retroactive effect, we apply the usual statutory construction rules to determine whether it should be applied to pending cases.

b. However, if the statute does have retroactive effect, we employ the strong presumption against applying a statute with retroactive effect to pending cases: At this point, only Congress's *clear* intent to apply the statute retrospectively will overcome the presumption.[9]

More succinctly, then, we (1) look for an express command in either direction; (2) discern whether there is congressional intent to only apply a statute prospectively; (3) analyze the statute for retroactive effect; and (4) look for clear intent to apply the statute retrospectively (if it has a retroactive effect) or simply use normal rules of construction to determine the statute's temporal reach. Now that we have sketched the *Landgraf/Lindh* framework for retrospective application of statutes, we must apply it to this case.

### III. Application of *Landgraf/Lindh*

#### A. Express Command

■ First, we ask whether Congress has expressly prescribed the temporal reach of the statute. Mathews makes a not-very-con-

---

7. One might ask why this quest for congressional intent only applies one way: We look for an intent to apply a statute prospectively, but not an intent to apply one retrospectively. While this may seem illogical, the reason becomes apparent in the next step. If the statute is found to have a "retroactive effect," it can be applied retrospectively only if Congress has expressed a *clear* intent to do so—because of the strong presumption against applying statutes retrospectively. Therefore, at the second step, it would serve no purpose to search for congressional intent *to* apply the statute retrospectively; if such an intent were found, we would still need to examine the statute for a retroactive effect and—if such an effect were found—only Congress's *clear* intent would be sufficient to apply the statute retrospectively.

8. However, as the Court noted in *Landgraf,* even procedural rules are subject to the presumption against retroactivity in a case in which the procedures affected have already transpired (e.g., the filing of a complaint in a pending case, evidentiary rulings in a case in which trial has been completed). *See Landgraf,* 511 U.S. at 275 n. 29, 114 S.Ct. 1483.

9. *See, e.g., Landgraf,* 511 U.S. at 270, 114 S.Ct. 1483 ("Since the early days of this Court, we have declined to give retroactive effect to statutes burdening private rights unless Congress had made clear its intent."); *id.* at 268, 114 S.Ct. 1483 ("[A] requirement that Congress first make its intention clear helps ensure that Congress itself has determined that the benefits of retroactivity outweigh the potential for disruption or unfairness.").

vincing argument that Congress has spoken expressly on the temporal reach of the RICO Amendment and that it is only to apply prospectively. He bases this contention on the language in section 108 of the Reform Act (the "Applicability Provision"). The Applicability Provision directs that "[t]he amendments made by this title shall not affect or apply to any private action arising under title I of the Securities Exchange Act of 1934 or title I of the Securities Act of 1933, commenced before and pending on the date of enactment of this Act." Pub.L. No. 104–67, § 108, 109 Stat. 737, 758 (1995).[10] Mathews submits that his RICO claims "arise under" the securities laws because these laws are an "essential element" of his claims and the outcome depends upon their interpretation and/or application. This argument is a flawed attempt to analogize to one aspect of the well-pleaded complaint rule. *See Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 13, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983) ("Even though state law creates appellant's causes of action, its case might still 'arise under' the laws of the United States if a well-pleaded complaint established that its right to relief under state law requires resolution of a substantial question of federal law in dispute between the parties."). Mathews in effect argues that, while RICO creates his cause of action, this is a case "arising under" the securities laws (for purposes of the Applicability Provision)

because his right to relief requires resolution of substantial questions of the securities laws.

Contrary to Mathews's submission, we find that his claims arise under RICO, as that is the federal cause of action Mathews alleges. *See American Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260, 36 S.Ct. 585, 60 L.Ed. 987 (1916) ("A suit arises under the law that creates the cause of action."). Indeed, in his own complaint, Mathews alleges that his claims arise under RICO, not the securities laws, and he bases federal jurisdiction on the RICO statute. Thus, there is no express prescription in the statute directing application of the RICO Amendment prospectively or retrospectively.[11]

## B. Intent to Apply Prospectively

The second step under the *Landgraf /Lindh* analysis is to examine a statute under normal rules of statutory construction for evidence of congressional intent to apply the statute prospectively only.[12] This is the step that the Court added in *Lindh*. We only reach this stage if Congress has not provided us with an "express command"; we need not bother with the next stage—analysis of whether the statute has retroactive effect—if an intent to apply the statute prospectively can be found. Therefore, using normal rules of statutory construction, we must look for an intent to apply a statute prospectively only.

---

**10.** The "amendments made by this title," referred to in the Applicability Provision, include: (1) new procedural and substantive provisions that apply to private actions under the 1933 and 1934 Acts; (2) a reaffirmation (or restoration) of the SEC's authority to bring aiding-and-abetting claims under the securities laws; and (3) foreclosure of civil RICO claims that rely on conduct that would have been actionable under the federal securities laws.

**11.** In support of his argument, Mathews cites *Fujisawa Pharmaceutical Co. v. Kapoor*, 115 F.3d 1332 (7th Cir.1997), arguing that the Seventh Circuit "held that the right to maintain a pending RICO case was preserved by Section 108 where the claim was based on securities acts violations." Appellees' Br. at 7. This, however, was not the holding in *Fujisawa*. Rather, the court held that the Applicability Provision in section 108 preserves RICO claims that are "part of an action brought under the securities laws *as well*." *Fujisawa*, 115 F.3d at 1338 (emphasis added).

In *Fujisawa*, as here, plaintiff's securities-law claims were time-barred. Yet, in *Fujisawa*, plaintiff pled these claims, only to have them dismissed as time-barred by the district court (a dismissal which the court of appeals affirmed). Therefore, Fujisawa's RICO claims were "part of an action brought under the securities laws as well." While we express doubt regarding the soundness of the holding in *Fujisawa*—allowing RICO claims to fall under the Applicability Provision only by piggybacking on time barred securities-law claims—we need not reach this issue, as Mathews pled no pure (non-RICO) federal securities-law claims.

**12.** An argument can be made—and is made by the defendants—that congressional intent to apply the RICO Amendment retrospectively can be discerned. While we find no such intent in the statute or legislative history, *see infra* Part III.D, we emphasize that, at this stage of the retroactivity analysis, we are only searching for intent to apply the statute *prospectively*.

Here, we find no such intent. Neither the negative inference at work in *Lindh* nor legislative history expressing an intent to apply the RICO Amendment only to new cases can be found. Indeed, as we discuss below, there is a dearth of discussion on the Applicability Provision in the statutory record. The text of the Provision also provides no clues, mentioning only private actions arising under the 1933 and 1934 Securities Acts.[13] Therefore, we must turn to the next step in the analysis, examination of the statute for retroactive effect.

### C. Retroactive Effect

Defendants argue that the RICO Amendment does not have a retroactive effect, but is simply a jurisdictional statute. They also argue that, even if the Amendment does have a retroactive effect, Congress has clearly expressed its intent to have the Amendment apply to pending cases, thereby eliminating plaintiff's RICO claims. We conclude that the Amendment does have a retroactive effect and we find no clear congressional intent to apply the Amendment retrospectively.

### 1.

A statute is deemed to have retroactive effect if "it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf*, 511 U.S. at 280, 114 S.Ct. 1483. Defendants admit that, in a sense, retrospective application of the statute would impair some rights that Mathews had, for prior to the passage of the Act, he had a RICO cause of action based upon defendants'

alleged actions, but afterward he would not. Nevertheless, they argue that the Amendment here simply altered a jurisdictional statute, 18 U.S.C. § 1964(c). Specifically, § 1964(c) permits plaintiffs to "sue ... in any appropriate United States district court" for injuries caused by violations of RICO. The RICO Amendment qualifies this language in § 1964(c) by excluding RICO claims predicated on "any conduct that would have been actionable as fraud in the purchase or sale of securities."

Defendants point out that courts "have regularly applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed." *Landgraf*, 511 U.S. at 274, 114 S.Ct. 1483. For, as the Court in *Landgraf* explained, "[a]pplication of a new jurisdictional rule usually 'takes away no substantive right but simply changes the tribunal that is to hear the case.' Present law normally governs in such situations because jurisdictional statutes 'speak to the power of the court rather than to the rights or obligations of the parties.'" *Id.* (citations omitted). Applying these precepts from *Landgraf*, defendants argue that the RICO Amendment "ousts jurisdiction" of the district court to hear a securities-based RICO case, and that it therefore does not have a retroactive effect, requiring dismissal of this action.

While § 1964(c) is phrased in federal jurisdictional terms, the Supreme Court has interpreted the RICO statute as providing for concurrent state jurisdiction over RICO actions. *See Tafflin v. Levitt*, 493 U.S. 455, 458, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990).[14]

---

13. As noted *supra* Part III.A, we find unpersuasive plaintiff's argument that his RICO claim is covered by the Applicability Provision's reference to the 1933 and 1934 Acts, as the securities-based RICO claim depends on an interpretation of those acts for its disposition. We find the text of the Applicability Provision both inapplicable to Mathews's RICO claim and unhelpful in resolving the question of whether Congress intended the RICO Amendment to have only prospective application.

14. Given that this case originated in federal court, we need not decide whether the RICO Amendment ousts *state* courts as well of their

jurisdiction to hear securities fraud-based RICO claims. We note in passing, however, that if the amended section of the RICO statute, § 1964(c), is the source of state court jurisdiction, it is doubtful whether the RICO Amendment affects only federal jurisdiction rather than all securities fraud-based RICO claims. In fact, the sponsor of the RICO Amendment in the House argued for its adoption on the ground that, without it, "attorneys could then do an end run around all of the [securities-law] reform by simply using the RICO statute." 141 Cong. Rec. H2771 (daily ed. Mar. 7, 1995) (statement of Rep. Cox). If the Amendment was aimed only at ousting federal court jurisdiction, this argument would have lit-

Therefore, an amendment to § 1964(c), while literally addressed to the jurisdiction of the federal courts, would appear to affect all securities fraud-based RICO claims. Apparently, no tribunal retains the authority to hear a RICO case predicated on securities fraud; rather, the "substantive right" to bring such a case in both state and federal court is affected by the RICO Amendment. The Amendment therefore is not like the portion of the AEDPA addressed in *Salazar–Haro v. INS*, 95 F.3d 309 (3d Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1842, 137 L.Ed.2d 1046 (1997), which fell within the traditional category of jurisdictional provisions in explicitly precluding review within particular fora of certain deportation orders. *See id.* at 310.

It is clear from the legislative history that the intention behind the RICO Amendment was "to address a significant number of frivolous actions based on alleged securities law violations." 141 Cong. Rec. H2771 (daily ed. Mar. 7, 1995) (statement of Rep. Cox); *see also* H.R. Conf. Rep. No. 104–369, at 47 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 746 ("The [Conference] Committee intends this amendment to eliminate securities fraud as a predicate offense in a civil RICO action."). There is no discussion in the minimal attention given to the RICO Amendment of either "jurisdictional" matters or even the "power" of the federal courts to hear a particular type of claim. Rather, focus was clearly on the substance of claims such as the present one and on completely eliminating the so-called "treble damage blunderbuss of RICO," 141 Cong. Rec. H2771 (daily ed. Mar. 7, 1995) (statement of Rep. Cox), in securities fraud cases.

Other courts have held that retrospective application of the RICO Amendment does not "impair rights a party possessed when he acted," because "a plaintiff's right to recover for securities fraud under RICO was an unintended situation." *Krear v. Malek*, 961 F.Supp. 1065, 1073 (E.D.Mich.1997).[15] We find this argument unpersuasive. First, whether or not a particular cause of action was created intentionally, its subsequent elimination still impairs rights that existed after the cause of action was recognized. Further, racketeering activity in the RICO statute is defined to include "fraud in the sale of securities," 18 U.S.C. § 1961(1)(D) (1994), calling into question the notion that securities-based RICO claims were unintended.[16]

We find further support for our conclusion that the RICO Amendment has retroactive effect in a different formulation of this issue in *Landgraf*. The Court said that a statute has retroactive effect if it "attaches new legal consequences to events completed before its enactment." *Landgraf*, 511 U.S. at 270, 114 S.Ct. 1483. In this case, the events in question are the alleged fraudulent acts by the defendants. If the RICO Amendment is applied to this case, it would attach new legal consequences to these events. Before the Amendment, the legal consequences included liability under the federal securities laws and RICO; after the Amendment, the legal consequences included liability only under the securities laws. *Cf. Armbruster v. Unisys Corp.*, 32 F.3d 768, 771 n. 3 (3d Cir.1994) (noting that clear congressional intent is required to apply a statute retrospectively if doing so "altered the extent of a party's liability").

---

tle force, as attorneys could still do "an end run" around the Act's reforms simply by filing RICO cases in state court.

**15.** The courts in both *Krear* and *Rowe v. Marietta Corp.*, 955 F.Supp. 836 (W.D.Tenn.1997), based their determination that retrospective application of the RICO Amendment would not impair plaintiffs' rights at least in part on the ground that the plaintiffs in those cases retained viable securities-law claims after the RICO claims were dismissed. *See Krear*, 961 F.Supp. at 1074; *Rowe*, 955 F.Supp. at 846–47. We question whether it is appropriate to determine the temporal reach of the RICO Amendment on a case-by-case basis, based on the existence (or lack thereof) of non-

RICO claims in plaintiff's case. Nonetheless, we note that the reasoning of the *Krear* and *Rowe* courts is inapplicable in this case, as Mathews's cause of action includes only RICO claims.

**16.** We express no opinion about the argument that Congress never intended civil litigants to be able to avoid the specific procedural and substantive provisions of the federal securities laws (including the limitations on damages) by using the RICO statute and its treble damages provision. We simply take issue with the *Krear* court's assertion that securities fraud-based RICO claims were themselves wholly unintended and its conclusion therefrom that eliminating such claims destroys no rights.

The Court's ultimate decision in *Landgraf* is also instructive. The Court found that applying the particular amendment to Title VII that was at issue there would have retroactive effect. That amendment, creating a right to compensatory and punitive damages (where only back pay had been previously available), "can be seen as creating a new cause of action, and its impact on parties' rights is especially pronounced." *Landgraf*, 511 U.S. at 283, 114 S.Ct. 1483. If a change in the law from back pay to compensatory and punitive damages is seen as *creating* a new cause of action and impairing a party's rights, certainly a change from treble damages (under RICO) to compensatory damages alone (under the securities laws) may be seen as *destroying* a cause of action and impairing a party's rights. The Court also noted that it had "not classified a statute introducing damages liability as the sort of 'remedial' change that should presumptively apply in pending cases." *Id.* at 285 n. 37, 114 S.Ct. 1483. We find it unlikely, then, that the Court would classify a statute eliminating damages liability as one that should presumptively apply to pending cases.

### 2.

The Supreme Court's unanimous decision in a case in which it focused on an ostensibly jurisdictional statute such as the one here further supports our conclusion. In *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997), the Court refused to apply retrospectively a statute that expanded the universe of plaintiffs who could bring certain qui tam claims under the False Claims Act ("FCA"). While acknowledging that the FCA amendment was phrased in "jurisdictional terms," the Court held that the amendment "essentially creates a new cause of action, not just an increased likelihood that an existing cause of action will be pursued." *Id.* at 1878. The Court rejected an argument that the amendment was merely "jurisdictional" and therefore had no retroactive effect (an argument identical to defendants' here). This is an additional reason for distinguishing our earlier pre-*Hughes* decision in *Salazar–Haro*. That case relied heavily on the substantive/jurisdictional dichotomy, *see*

95 F.3d at 311, yet the fact that a statute is phrased in jurisdictional terms is not reason enough to ignore the strong presumption against retroactivity, *see Hughes*, 117 S.Ct. at 1878.

The *Hughes* Court's reasoning, directly applicable to the present case, is worth rescribing at length:

> The fact that courts often apply newly enacted jurisdiction-allocating statutes to pending cases merely evidences certain limited circumstances failing to meet the conditions for our generally applicable presumption against retroactivity, not an exception to the rule itself. . . . As we stated in *Landgraf*:
>
>> "Application of a new jurisdictional rule usually 'takes away no substantive right but simply *changes* the tribunal that is to hear the case.' Present law normally governs in such situations because jurisdictional statutes 'speak to the power of the court rather than to the rights or obligations of the parties.' " [*Landgraf*, 511 U.S. at 274, 114 S.Ct. 1483 (emphasis added in *Hughes* ).]
>
> Statutes merely addressing *which* court shall have jurisdiction to entertain a particular cause of action can fairly be said merely to regulate the secondary conduct of litigation and not the underlying primary conduct of the parties. Such statutes affect only *where* a suit may be brought, not *whether* it may be brought at all. The 1986 amendment [to the FCA], however, does not merely allocate jurisdiction among fora. Rather, it *creates* jurisdiction where none previously existed; it thus speaks not just to the power of a particular court but to the substantive rights of the parties as well. Such a statute, even though phrased in "jurisdictional" terms, is as much subject to our presumption against retroactivity as any other.

*Id.* (citations omitted).

In *Hughes*, the Court concluded that retrospective application of the FCA Amendment would have the legal effect of depriving the defendant of a particular defense, and that this constituted a retroactive effect. *See id.*

at 1878–79. In the case at bar, retrospective application of the RICO Amendment would have the legal effect of depriving plaintiffs of a claim, which also constitutes a retroactive effect. The RICO Amendment, like the amendment at issue in *Hughes*, does not simply allocate jurisdiction among fora, determining where a claim might be brought; rather, it "[destroys] jurisdiction where [it] previously existed; it thus speaks not just to the power of a particular court but to the substantive rights of the parties as well." *Id.* at 1878.[17] Therefore, as in *Hughes*, we find that the allegedly jurisdictional amendment at issue here has retroactive effect. We then must look for clear intent from Congress to apply the new provision retrospectively.

### D. Clear Intent to Apply Retrospectively

Defendants argue that the text of the RICO Amendment and its legislative history imply that Congress intended it to have retrospective application. We note at the outset that, given our finding that the Amendment has retroactive effect, a weak inference of Congress's intent is insufficient for retrospective application.[18] Rather, only Congress's expression of a clear intent that the statute be applied retrospectively will suffice. *See Landgraf,* 511 U.S. at 270, 114 S.Ct. 1483.[19] Defendants, in arguing that Congress intended the Amendment to have retrospective application, rely on the statute's text, its purpose, and its legislative history. We consider each in turn.

### 1. Text of the Act

First, according to defendants, because Title I of the Reform Act amended three different things—private actions under the 1933 and 1934 Securities Acts; the SEC's authority to bring aiding-and-abetting claims under the securities laws; and civil securities fraud-based RICO claims—but the Applicability Provision only *expressly* provides for prospective application of the first of these, by negative implication, Congress must have intended retrospective application of the second and third category of amendments. According to defendants:

> By carefully distinguishing between amendments that relate to private actions under the Securities Laws on the one

---

**17.** Consider a useful analogy: an amendment in which Congress reduced the statute of limitations under RICO (which is currently longer than the limitations period under the securities laws). Would we apply such an amendment retrospectively and bar Mathews's claim here? We suspect not, yet that is effectively what defendants are requesting that we do. *Cf. Burns v. Morton,* 134 F.3d 109, 111 (3d Cir.1998) (refusing to apply retrospectively a new statute of limitations in 28 U.S.C. § 2244(d)). Likewise, we would hesitate (absent clear congressional language to the contrary) to apply retrospectively a statute that eliminated treble damages under RICO. Rather, under *Landgraf* and *Hughes*, we would likely find that such an amendment affects the substantive rights of the parties and thus is presumed to apply only prospectively. Similarly, we fail to see how plaintiff's substantive rights would not be affected by retrospective application of the RICO Amendment in this case. Contrary to defendants' assertion, the Amendment does not merely affect "the secondary conduct of litigation" rather than the underlying "primary conduct of the parties." The primary conduct of the parties will certainly be affected now that defendants like Kidder, Peabody no longer find themselves subject to RICO's treble damages liability or its longer statute of limitations.

**18.** The RICO Amendment was enacted, as part of the PSLRA, in late 1995, more than a year and a half after the *Landgraf* decision was issued.

While we express no opinion on Congress's obligation to parse every Supreme Court opinion for guidance, when the Court emphasizes "a requirement that Congress first make its intention clear," we are reluctant to find such intention in a statute passed more than a year later absent the utmost clarity.

**19.** Even were we to conclude that the Amendment is without retroactive effect, normal rules of statutory construction—along with the "general presumption *against* retroactivity," *Hughes,* 117 S.Ct. at 1878—would lead us to conclude that the Amendment should not be given retrospective application. We emphasize that the Court has clearly instructed that the general presumption against retroactivity applies at all times and not only when a statute is found to have retroactive effect. *See Lindh,* 117 S.Ct. at 2062 (re-affirming the "presumption against retroactivity"); *Hughes,* 117 S.Ct. at 1876 ("To the extent respondent contends that *only* statutes with [retroactive effect] are subject to our presumption against retroactivity, he simply misreads our opinion in *Landgraf.*"). Further, in *Hughes,* a unanimous Court unequivocally rejected the notion that a jurisdictional statute enjoys "a strong presumption *in favor of* retroactivity." *Id.* at 1878.

hand, and amendments that relate to the SEC's enforcement powers and to civil RICO actions on the other, Congress demonstrated that it knew how to restrict the application of specific provisions of the Reform Act to future filed cases. By expressly stating that the amendments affecting private actions under the Securities Laws shall only apply prospectively, Congress demonstrated its intent that the RICO Amendment and the SEC Provision should not be so restricted. . . .

Appellants' Br. at 21 (citing *Lindh* ).

Contrary to defendants' implication, however, the Court in *Lindh* did not use a negative inference such as this to find the "clear intent" required to overcome a statute's retroactive effect, or even the intent we might look for to determine the temporal reach of a statute without retroactive effect. Rather, it used the negative inference to find that Congress intended a statute *not* to have retrospective application, rendering the entire retroactive-effect analysis unnecessary. *See Lindh*, 117 S.Ct. at 2063. We decline to turn the *Lindh* analysis on its head and to use nothing more than a negative inference to discern a *clear* intent to apply a statute with retroactive effect to pending cases, thereby forcing them out of court.[20]

Even were we inclined to rely on a negative inference in a case such as the present one, we note that the reference to only the 1933 and 1934 Acts in the Applicability Provision lends itself to interpretations other than

defendants' negative inference. It is possible that Congress mentioned only the amendments to the securities laws (and provided for their non-retroactivity) because of concern that many of these provisions, being procedural in nature, might be applied retrospectively in the absence of express statutory language to the contrary. *See Landgraf,* 511 U.S. at 275, 114 S.Ct. 1483 ("Changes in procedural rules may often be applied in suits arising before their enactment without raising concerns about retroactivity."). By contrast, since the RICO Amendment was not procedural, no express provision was necessary to ensure that it would not be applied retrospectively. Rather, Congress quite likely intended the RICO Amendment to be governed by the usual rules of statutory interpretation,[21] including the analysis outlined in *Landgraf,* which was decided more than a year before the RICO Amendment was passed. We find this "inference" to be at least as strong as the one defendants attempt to draw from the lack of statutory language directly addressing the temporal reach of the RICO Amendment.

The Court in *Lindh* reached a similar conclusion regarding an applicability provision in the statute at issue there, which also applied only to certain portions of the entire statutory enactment. The Court posited that Congress might have been concerned about the judicial interpretation of a provision affecting both procedure and substantive rights, as it

---

**20.** Defendants cite our recent decision in *Southwestern Pennsylvania Growth Alliance v. Browner,* 121 F.3d 106 (3d Cir.1997), in support of their negative inference argument. In that case, we used the statutory interpretation canon *expressio unius est exclusio alterius* to conclude that a statute permitting judicial review of certain agency actions should be applied retrospectively to permit review of legislative rules promulgated before the effective date of the statute. *See id.* at 120 (noting that prospective application of the judicial review provision was explicitly required by the statute only for *interpretative* rules, not the *legislative* rules at issue in the case).

In *Southwestern Penn.,* we did not use the detailed formula outlined *supra* Part II.C. Nonetheless, we were fully cognizant in that case of the need to determine if "a statute's terms would produce a retroactive effect," 121 F.3d at 120 (internal quotations omitted), and we concluded the statute there did not, *see id.* ("[T]he SBRE-FA amendment concerning judicial review does

not retroactively alter substantive rights, duties or liabilities."). Given this conclusion, we used "normal rules of [statutory] construction," *id.* (internal quotations omitted), to determine the temporal reach of an amendment which "prospectively changed the jurisdiction of the federal courts to allow judicial review of an agency's compliance with [a statute]." *Id.* This reasoning and result are fully consistent with our explication of the post-*Lindh* retroactivity analysis and our conclusion in the present case.

**21.** Though reaching a different ultimate conclusion than we reach, the court in *Rowe v. Marietta Corp.* similarly found that the reference to only a portion of the Reform Act in the Applicability Provision indicated that "Congress intended the regular judicial rules of construction to apply" to the RICO Amendment. 955 F.Supp. 836, 848 (W.D.Tenn.1997).

was unclear after *Landgraf* whether the presumption against applying substantive statutes retrospectively or the qualified support for applying procedural statutes retrospectively would take precedence. *Lindh*, 117 S.Ct. at 2063–64. Therefore, Congress may have read *Landgraf* "as counseling the wisdom of being explicit if it wanted such a provision to be applied to cases already pending." *Id.* at 2064.

The Court went on to note that the same uncertainty (regarding judicial interpretation of the temporal reach of a "mixed" statute) was true of the provision at issue in that case, to which Congress had attached no applicability provision. *See id.* Congress's intent for the provision at issue in *Lindh*, the Court then concluded, must have been to leave the determination of retroactivity to the usual judicial interpretative tools, including the canons of statutory interpretation and the presumption against retrospective application of new statutes. The dissent in *Lindh* made a similar point: "Congress, while intending the AEDPA definitively to apply to pending capital cases, could have been uncertain or in disagreement as to which of the many portions of [the noncapital provisions] should or should not apply to pending cases. Congress could simply have assumed that the courts would sort out such questions, using our ordinary retroactivity presumptions." *Id.* at 2069 (Rehnquist, C.J., dissenting). Where the majority and dissent differed was on the conclusions reached after applying "ordinary retroactivity presumptions."

Earlier, in *Landgraf,* the Court made an analogous point, noting that it was "entirely possible—indeed, highly probable—that, because it was unable to resolve the retroactivity issue with the clarity of [prior] legislation, Congress viewed the matter as an open issue to be resolved by the courts." 511 U.S. at 261, 114 S.Ct. 1483. Rejecting a negative-inference argument by the party arguing for retrospective application in that case, the Court held that "[w]e do not read either provision as doing anything more than definitively rejecting retroactivity with respect to the specific matters covered by its plain language." *Id.* at 261 n. 12, 114 S.Ct. 1483.

We find that the text of the Reform Act on which defendants here rely is open to a similar interpretation. Perhaps concerned that a "mixed" substantive and procedural provision might be given retrospective application, Congress explicitly provided for the temporal reach of the amendments affecting private causes of action under the securities laws. Less concerned about the more narrowly focused RICO and SEC Amendments, Congress failed to provide for their temporal reach, leaving resolution of this issue to the courts. The point is not that our inference is the correct one, nor even necessarily the most plausible one (though we believe it to be eminently plausible).[22] Rather, the point is that the text (and lack thereof) on which defendants rely is equally probative of a conclusion that the substantive provision at issue here should be applied only prospectively as it is of a conclusion that it should be applied to pending cases.[23]

In sum, we are unwilling to adopt defendants' negative inference from the text of the Applicability Provision. The text is addressed only to one of the three categories of amendments in Title I of the Reform Act. We refuse to read a clear intent from the *absence* of language in the Applicability Provision, or elsewhere in the Reform Act, addressing the temporal reach of the RICO Amendment. Particularly given the strong presumption against retroactivity, it would be strange indeed if Congress had used a silent negative

**22.** Another possible explanation is that the "failure to provide a clear expression of intent [regarding the RICO Amendment] resulted from the rushed nature of the debate and the proposal of the amendment." *In re Prudential Securities Inc. Ltd. Partnerships Litig.,* 930 F.Supp. 68, 81 (S.D.N.Y.1996); *see also Krear,* 961 F.Supp. at 1078 n. 20 (noting "that Congress could certainly have been more lucid in the drafting of this amendment").

**23.** This is not a case like *Scheidemann v. INS,* in which we used a textual analysis to discern congressional intent to apply a statute retrospectively, given that to do otherwise would have rendered portions of the statute ineffective, redundant, and "absurd." 83 F.3d 1517, 1524–26 (3d Cir.1996).

inference to indicate that the RICO Amendment should be applied *retrospectively*.

### 2. Policy of the Act

Defendants argue that the policy undergirding the Reform Act makes clear that the RICO Amendment should be applied retrospectively. The purpose of the Act, according to defendants, was to foreclose the use of RICO in securities cases, as such use was unintended[24] and plaintiffs are afforded an adequate remedy under the securities laws. Defendants submit that Congress believed that civil RICO, with its treble damages remedy and attorneys' fees provision, had been used for its *in terrorem* effect in garden variety securities disputes. Therefore, with the encouragement of the SEC, Congress moved to get rid of the availability of RICO for securities cases. Under this view, Congress's purpose would be thwarted if the RICO Amendment was not applied retrospectively because Congress was merely correcting an unintended mistake.

While there is some support for this alleged intent of Congress in the legislative history,[25] we emphasize again that if Congress felt it necessary to apply the RICO Amendment retrospectively in order to fulfill this policy, it would have been a simple matter to say so. Particularly in light of the Supreme Court's pre-PSLRA decision in *Landgraf*, we find untenable the argument that Congress would rely on an unstated, underlying policy to send the message to the courts that a statutory enactment should be applied to pending cases. When the Supreme Court requires Congress to speak in "express commands," "unambiguous directives," or "clear statements," *Lindh*, 117

S.Ct. at 2062, an appeal to inchoate policies will not suffice. *See Landgraf*, 511 U.S. at 285–86, 114 S.Ct. 1483 (noting that even when "retroactive application of a new statute would vindicate its purpose more fully ... [this] is not sufficient to rebut the presumption against retroactivity"); *see also Hook v. Ernst & Young*, 28 F.3d 366, 372 (3d Cir.1994) (noting that even when "restorative intent is apparent, such intent does not reveal whether Congress intended[an] amendment to apply retroactively").

While defendants rely on the underlying policy of the RICO Amendment, we note that there is a competing policy at work here, namely the policy against retrospective application of new statutes:

> [R]etroactive statutes raise particular concerns. The Legislature's unmatched powers allow it to sweep away settled expectations suddenly and without individualized consideration. Its responsivity to political pressures poses a risk that it may be tempted to use retroactive legislation as a means of retribution against unpopular groups or individuals.

*Landgraf*, 511 U.S. at 266, 114 S.Ct. 1483. These concerns, while perhaps not as serious as in a case involving more traditionally "unpopular groups or individuals," are certainly applicable here. As defendants acknowledge, in enacting the PSLRA, Congress was concerned with the alleged "abusive practices"[26] of "shrewd plaintiffs' attorneys."[27] In reacting to the perceived abuses by so-called professional plaintiffs and their attorneys, and the frustration within the business community at having to defend allegedly burdensome and frivolous RICO suits, Congress

---

**24.** We assume here, for the sake of discussing defendants' policy argument, that the application of civil RICO to securities fraud was "unintended"; we note, however, that this is far from a given. *See* 18 U.S.C. § 1961(1)(D); *see also supra* Part III.C.1.

**25.** *See, e.g.*, H.R. Conf. Rep. No. 104–369, at 47 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 746. There are some indications, however, that Congress evinced no intent with respect to the RICO Amendment, but rather that the Amendment was rushed through committee and added to the Reform Act the day before the House passed the Act. *See* 141 Cong. Rec. H2774, H2778 (daily ed.

Mar. 7, 1995) (statement of Rep. Dingell); *id.* at H2778 (statement of Rep. Markey) (noting that the RICO Amendment was "a subject with no information before us except the opinions of a few Members who have been able to get a non-germane amendment put in order"). The debates over the Reform Act in the Senate include scant attention to the RICO Amendment.

**26.** Pub.L. No. 104–67, § 103, 109 Stat. 737, 756 (1995).

**27.** 141 Cong. Rec. H2770 (daily ed. Mar. 7, 1995) (statement of Rep. Cox).

could have gone so far as to destroy vested rights and obligations. But, as the Supreme Court has emphasized, if Congress seeks to respond to these political pressures in this manner, by reaching back in time to upset settled expectations, it must do so unequivocally and in a way that assures us that it has seriously considered the consequences of such action. We find no such unequivocal expression of intent here.

### 3. Legislative History

Finally, defendants rely on the legislative history of the RICO Amendment and the Applicability Provision to argue that the Amendment should be applied retrospectively. Defendants note that the bill that originally passed in the House of Representatives had a provision explicitly precluding retrospective application of *all* provisions in the Act. *See* H.R. 1058, 104th Cong. § 9 (1995) ("This Act and the amendments made by this Act are effective on the date of enactment of this Act and shall apply to cases commenced after such date of enactment."). The original Senate bill had no applicability provision. *See* 141 Cong. Rec. S1076–S1084 (daily ed. Jan. 18, 1995) (introducing S. 240, 104th Cong. (1995)). When the Senate revised its bill, it added, *inter alia*, an applicability provision that tracks the one finally passed as part of the Reform Act. *See id.* at S8890 (daily ed. June 22, 1995) (considering amended S. 240, 104th Cong. § 110 (1995)). According to defendants, the Senate explicitly rejected the House applicability provision, which provided for prospective application of *all* amendments in the Reform Act, choosing instead a more limited applicability provision that did not provide for prospective application of the RICO Amendment. This choice was later codified into law when the Conference Committee chose—and both houses of Congress enacted—the Senate's more limited applicability language. Thus, defendants aver, Congress "deliberately" chose the more limited applicability provision because it sought to apply the RICO Amendment to pending cases.

Once again, however, we find defendants' reliance on unstated intentions, absent language, and explicit congressional directives in non-RICO areas of the Reform Act to be far from the clear evidence we seek when discerning congressional intent. We note that defendants offer no passages within the legislative history in which the issue of retroactivity is even discussed, let alone explicitly endorsed—no floor statements, no debate on the issue, nothing in congressional reports on the Reform Act, including the final Conference Committee Report. *See* H.R. Conf. Rep. No. 104–369 (1995); *see also* 1995 U.S.C.C.A.N. 679–748; *cf. United States v. Olin Corp.*, 107 F.3d 1506, 1514 (11th Cir. 1997) (applying provision of CERCLA retrospectively, given text and purpose of statute, and extensive comments by legislators indicating their assumption that provision would be applied retrospectively). We are extremely reluctant to find the "clear statement" of congressional intent required by the *Landgraf/Lindh* analysis in the unexplained and unremarkable alteration of language in what was clearly a minor aspect (i.e., the Applicability Provision) of a complex legislative scheme.

### IV. Conclusion

Defendants urge us to apply the RICO Amendment retrospectively to eliminate plaintiff's (and other similarly situated plaintiffs') securities-based RICO claims. We find no express command from Congress that we do so. We also fail to see—in the underlying policy of the RICO Amendment (or of the Reform Act as a whole), in the simple text of the Applicability Provision, or in the sparse legislative history on this issue—the clear statement required to overcome the retroactive effect that would result from applying the Amendment to pending cases. As the Supreme Court has recently reiterated in *Landgraf, Hughes,* and *Lindh,* our courts have long looked with disfavor on the retrospective application of new statutes. Settled expectations and vested rights and obligations are highly prized in our legal system. Absent clear evidence "that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits," *Landgraf,* 511 U.S. at 272–73, 114 S.Ct. 1483, we are extremely reluctant to create causes of action

that did not previously exist, or—as in this case—to destroy causes of action and remedies that clearly did exist before Congress acted.

We hold that the RICO Amendment of the Private Securities Litigation Reform Act does not apply to cases pending at the time the Act was enacted. We therefore affirm the order of the district court that Mathews may proceed with his RICO claims against Kidder, Peabody and the other defendants.