### MORTON INTERNATIONAL, INCORPORATED

v.

### A.E. STALEY MANUFACTURING COMPANY, et al.

### Velsicol Chemical Corporation, et al.

v.

### A.E. Staley Manufacturing Company, et al.

Nos. 96–3609 KSH, 96–3610 KSH.

United States District Court, D. New Jersey.

July 19, 2000.

Samuel Moulthrop, Riker, Danzig, Scherer, Hyland & Perretti, LLP, Morristown, NJ, for Morton International, Inc.

Lorraine Teleky–Petrella, Hackensack, NJ, for Velsicol Chemical Corp., NWI Land Management Co., Fruit of the Loom, Inc.

John Ralph Holsinger, Beattie Padovano, Montvale, NJ, for A.E. Staley Mfg. Co.

Michael L. Rodburg, Lowenstein Sandler PC, Roseland, NJ, for AIRCO Indust. Gases, Allied Chemical Corp., CIBA–Geigy Corp., Becton–Dickinson & Co., Inc., E.I. DuPont De Nemours & Co., Inc., Garfield Baring Corp., Union Carbide Corp., Allied-Signal, Inc.

Michael L. Rodburg, Lowenstein Sandler PC, Roseland, NJ, for Michael Rodburg, Defendants Liaison Counsel.

Denise D. Pursley, Nixon, Hargrave, Devans & Doyle, Garden City, NJ, Bobbie Anne Flower, Nixon Peabody LLP, Garden City, NJ, for Belmont Metals, Inc.

Pamela R. Esterman, Sive, Paget & Riesel, P.C., New York City, for Crouse-Hinds Sepco Corp., Wagner Elec. Co.

Nan Astrid Bernardo, Shanley & Fisher, P.C., Morristown, NJ, for Crown Zellerbach Corp., Day & Baldwin.

Rosalind M. Dendellen, Rosalind M. Kendellen, Zucker, goldberg, Becker & Ackerman, Mountainside, NJ, for Dura Elec. Lamp Co., Inc.

Robert Gordon Rose, Pitney, Hardin, Kipp & Szuch, Morristown, NJ, for Duracell, Inc.

Jane Kozinski, Saul, Ewing, Remick & Saul, Princeton, NJ, for Eastern Smelting & Refining.

John H. Klock, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, PC, Newark, NJ, for Henkel Corp.

Michael Kevin Mullen, Schenck, Price, Smith & King, Morristown, NJ, for Inmar Associates, Inc., Marvin H. Mahan.

Lynn Wright, Edwards Angell, LLP, Short Hills, NJ, for J.M. Ney Co.

Mark L. Manewitz, Grotta Glassman & Hoffman, P.A., Roseland, NJ, for Koppers.

Paul John Casteleiro, Hoboken, NJ, for Magnesium Elektron, Inc.

Harry M. Baumgartner, Shanley & Fisher, Morristown, NJ, for Marisol, Inc.

Russell Lyle Hewit, Dughi & Hewit, PC, Marlton, NJ, for Merck & Co., Inc.

Timothy Ignatius Duffy, McElroy, Deutsch & Mulvaney, Morristown, NJ, National Lead Co., Goldsmith Brothers Div.

Mark L. Czyz, Mttson & Madden, Newark, NJ, John H. Klock, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, PC, Newark, NJ, for Occidental Chemical Corp.

John J. Delany, III, Voorhees, NJ, for Phillips & Jacobs, Inc.

Hugh J. Mahoney, Newark, NJ, for Public Service Elec. & Gas.

Bruce R. Rosenberg, Winne, Banta, Rizzi, Hetherington & Basralian, P.C., Hackensack, NJ, for Randolph Products Co.

Laura Farina, Law Offices of Laura Farina, Princeton, NJ, Karen A. Mignone, McGovern Noel & Benik, Inc., Milburn NJ, for Ray–O–Vac Div. of ESB.

Steven Richman, Gallagher, Brody & Butler, Princeton, NJ, for Redland Minerals Ltd.

Dante J. Romanini, Kozlov, Seaton, Romanini, Brooks & Greenberg, PC, Cherry Hill, NJ, for Scientific Chemical Processing, Inc., Scientific Chemical Treatment Co., Inc., Scientific, Inc., Transtech Industries, Inc.

Christine G. Mooney, Manko, Gold & Katcher, Bala Cynwyd, PA, for Sylvania/GTE.

David Joseph D'Aloia, Saiber Schlesinger Satz & Goldstein, Newark, NJ, for Tenneco, Inc.

Gerold C. Thompson, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, DC, for Jerold C. Thompson.

George Van Cleve, Washington, DC, pro se.

David Paul Schneider, Bressler, Amery & Ross, PC, Florham Park, NJ, for BASF Corp.

Kenneth Howard Mack, Fox, Rothschild, O'Brien & Frankel, LLP, Lawrenceville, NJ; for FMC Corp.

## LETTER–OPINION AND ORDER

HEDGES, United States Magistrate Judge.

Dear Counsel:

### INTRODUCTION

This matter comes before me on the motion of Becton–Dickinson and Company, Inc., E.I. duPont de Nemours & Co., Inc., Garfield Refining Company, Inc., Union Carbide Corporation, Tennessee Gas Pipeline Company, the Connecticut Light and Power Company, Belmont Metals, Inc., Duracell, Inc., J.M. Ney Company, Merck & Co., Inc., and PSE & G ("site defendants") to amend their Answers. Defendant Occidental Chemical Corporation joins in the motion[1]. Plaintiffs Morton International, Inc., Velsicol Chemical Corporation, NWI Land Management Corporation and Fruit of the Loom ("plaintiffs") oppose the motion. I have considered the

1. "OxyChem" is a defendant and, like Henkel Corporation and Randolph Products, it previously owned the Diamond Shamrock Site, located adjacent to the Wood Ridge Chemical Corporation Site. OxyChem's corporate predecessor, Diamond Shamrock, is alleged to have shipped a *de minimis* amount of mercury to the Site for recycling from another location. OxyChem seeks to assert defenses under the Act and to counterclaim against plaintiffs for defense costs should plaintiffs' contribution lawsuit against OxyChem be unsuccessful.

2. The "Site" refers to approximately 40 acres located in Bergen County, New Jersey in the Boroughs of Wood Ridge and Carlstadt on the western bank of Berry's Creek within the Hackensack Meadowlands. The north and south boundaries of the Site are defined as the creek from its headwaters just below Teterboro Airport down to the Hackensack River.

3. From this forty-acre tract of land, mercury pollution seeped into Berry's Creek, the nearby tidal estuary of the Hackensack River, which flows through the Meadowlands. Below its surface, the Site was saturated by approximately 268 tons of toxic waste. "For

papers in support of and in opposition to the motion. There was no oral argument. Rule 78.

### PROCEDURAL HISTORY

Plaintiffs commenced this action in August of 1996 seeking contribution under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), as amended, 42 U.S.C. § 9601 *et seq.*, the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901, *et seq.*, the New Jersey Spill Compensation and Control Act ("Spill Act"), N.J.S.A. 58:10–23.11 *et seq.*, the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and under common law, for investigation and remediation costs undertaken at a former mercury manufacturing plant in Wood Ridge, New Jersey, now known as the "Ventron/Velsicol Superfund Site" (the "Site").[2] The costs were the result of significant mercury and other hazardous substance contamination.[3] The Site had been used for mercury processing operations for fifty years.[4] *State v. Ven-*

a stretch of several thousand feet, the concentration of mercury in Berry's Creek is the highest found in fresh water sediments in the world. The waters of the creek are contaminated by the compound methyl mercury, which continues to be released as the mercury interacts with other elements. Due to depleted oxygen levels, fish no longer inhabit Berry's Creek, but are present only when swept in by the tide and, thus, irreversibly toxified." *State v. Ventron,* 94 N.J. 473, 481–82, 468 A.2d 150 (N.J.1983).

4. From 1929 through 1943, F.W. Berk & Company, Inc. ("Berk U.S.A."), owned and operated by F.W. Berk & Company, Limited ("Berk U.K."), leased the Site from Carlstadt Development & Trading Co. ("CDTC"). Berk U.S.A. conducted mercury processing and other operations at a manufacturing facility at the Site, which operations resulted in the release of hazardous substance at, into, from and/or around the Site and the Berry's Creek area.

In 1943, title was transferred from CDTC to Berk U.S.A., which continued to operate the Plant, which operations continued to result in hazardous substance releases. During the

*tron,* 94 N.J. 473, 503, 468 A.2d 150 (N.J. 1983).

Plaintiffs were adjudicated liable for the contamination. *Ventron,* 94 N.J. at 482, 468 A.2d 150. In insurance coverage litigation, plaintiffs were found to have knowingly and intentionally polluted the Site. *Morton Int'l., Inc. v. General Accident Ins. Co.,* 134 N.J. 1, 95, 629 A.2d 831 (1993). Plaintiffs commenced this action, contending that site defendants are liable under CERCLA § 107(a)(3) and/or § 113(f) because they arranged for the disposal and/or treatment of mercury and/or other hazardous substances at the Site, therefore contributing to the Site's contamination. This action is now in its advanced stages. Discovery is closed, having resulted in the production of over 300,-000 pages of documents related to Site operations, conditions, and remedial activity, and the depositions of forty witnesses were conducted. Expert disclosures were exchanged, and a Final Pretrial Order was entered on November 17, 1999.

Before me is site defendants' motion to amend their Answers to add a defense. The defense is provided for in newly enacted legislation signed into law on November 29, 1999 by President William Jefferson Clinton, three years after the commencement of this action. The legislation is a rider to the Omnibus Budget Appropriations Act of 1999 (H.R.3194), Public Law No. 106–113, 113 Stat. 1501A–598 (1999).[5]

The new enactment, 42 U.S.C. § 9627 ("Section 127") provides for an exemption from liability under CERCLA § 107(a)(3) and (a)(4) for certain persons who arranged for recycling of recyclable material. 42 U.S.C. § 9627(a)(2). Section 127 includes a fee-shifting provision which provides that, "[a]ny person who commences an action in contribution against a person who is not liable by operation of this section shall be liable to that person for all reasonable costs of defending that action, including all reasonable attorneys' fees and expert witness fees." 42 U.S.C. § 9627(j). Section 127's application to pending cost recovery actions has not been addressed in this Circuit.

On December 6, 1999 and January 3, 2000, site defendants sought plaintiffs' withdrawal of their claims or consent to amend their Answers to assert the recycling defense and a claim for attorneys' fees pursuant to Section 127. The requests were denied. Site defendants now move to amend their Answers to assert the new defense and claim for attorneys' fees.

## DISCUSSION

*Standard of Review*

Rule 15(a) provides in relevant part that,

[a] party may amend the party's pleading once as a matter of course at any time before a responsive pleading is

1950's, Berk U.S.A. formed a joint venture with Magnesium Elektron, Inc. and leased a portion of the Site under the name "Melberk." Melberk conducted manufacturing operations on the Site, which operations continued the release of hazardous substances. In 1956, Berk U.K. sold Berk U.S.A. to George W. Taylor. In 1960, Wood Ridge Chemical Corp, a wholly-owned subsidiary of Velsicol Chemical Corporation ("Velsicol"), purchased the Site. From 1960 until 1968, Wood Ridge Chemical Corporation owned the Site and operated the plant on seven acres of the Site. In 1967, Wood Ridge Chemical Corp. declared a land dividend to Velsicol of approximately 33 acres within the Site. In 1986, the block and lots containing this 33 acres were conveyed to NWI Land Management. In 1968, Velsicol sold all of the stock of Wood Ridge Chemical Corp. to Ventron Corporation. From 1968 until 1974, Ventron, a predecessor in interest to Morton International, Inc., owned and operated the plant on the roughly seven-acre portion of the Site previously owned by Wood Ridge Chemical Corporation.

5. Incorporated into this Act on November 18, 1999 by cross-reference was the Intellectual Property and Communication Omnibus Reform Act of 1999 (S.1948). At the end of this bill is Section 6001, entitled "Superfund Recycling Equity", amending Section 127 of CERCLA to clarify "Liability Under CERCLA for Recycling Transactions". Pub.L. No. 106–113, § 6001, 113 Stat. 1501A–598 (1999).

served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice requires.

Leave to amend generally may be denied for four reasons: 1) undue delay; 2) bad faith or dilatory motive; 3) undue prejudice; or 4) futility of amendment. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *see Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1434 (3d Cir.1997). The federal rules reflect the "principle that the purpose of pleading is to facilitate a proper decision on the merits," and that if the underlying facts relied on by a party might be a proper subject of relief, that party should have the opportunity to test its claims on the merits. *Foman*, 371 U.S. at 182, 83 S.Ct. 227 (*quoting Conley v. Gibson*, 355 U.S. 41, 48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Therefore, courts should liberally permit amendments, and the discretion to do so rests with the trial court. *See, e.g., Heyl & Patterson v. F.D. Rich Housing of Virgin Islands*, 663 F.2d 419, 425 (3d Cir. 1981), *cert. denied*, 455 U.S. 1018, 102 S.Ct. 1714, 72 L.Ed.2d 136 (1982); *Elf Atochem North America, Inc. v. United States*, 161 F.R.D. 300, 301 (E.D.Pa.1995).

*Undue Delay, Bad Faith, Dilatory Motive*

■ Site defendants did not delay in making their motion. Within one week of the enactment of Section 127, site defendants requested the consent of plaintiffs to amend their Answers. After plaintiffs refused, site defendants promptly filed their motion. Thus, there has been no undue delay, as there is no evidence of bad faith or dilatory motive given that Congress so recently enacted the legislation.

*Prejudice*

■ Plaintiffs argue that granting leave to amend would result in undue prejudice to them. Plaintiffs also argue that Section 127 raises entirely new legal and factual issues that they have not had the opportunity to investigate, and therefore, they will be prejudiced if they do not have the opportunity to address these issues before trial. Plaintiffs contend that if site defendants are permitted to assert new counterclaims against plaintiffs for Section 127 attorneys' fees, plaintiffs would suffer prejudice, as they would be denied the opportunity to investigate the nature of these claims and prepare a defense.

Site defendants contend that plaintiffs will not be prejudiced by amendment because it does not alter the issues in the action or require additional discovery. Site defendants argue that the parties should have produced every document regarding the transactions at the Site and that plaintiffs have not identified any specific discovery that they now claim to need. Furthermore, site defendants argue that the addition of this defense is not a new issue in that the enactment of this statute confirms an emerging line of case law that holds that liability under CERCLA is not created and does not arise from disposal arrangements when one generates secondary materials which are useful products.[6] Site defendants contend that Section 127's defense is not significantly different from their Eleventh Affirmative Defense in their original Answers, which provides that,

> If Defendant[s] arranged for the treatment of material at the Site, that arrangement was consistent with the uses

---

6. For example, in *Pneumo Abex Corp. v. High Point, Thomasville and Denton Railroad Co.*, 142 F.3d 769 (4th Cir.) *cert. denied*, 525 U.S. 963, 119 S.Ct. 407, 142 L.Ed.2d 330 (1998), the Fourth Circuit held that agreements between railroads sending worn bearing containing lead to a foundry to be used to produce new bearings was not transactions for disposal. The bearings were valuable products and the parties intended that the bearings be reused in their entirety in the production of new bearings. 142 F.3d at 775.

and practice appropriate for those properties at all relevant times, consistent with industry practice, and otherwise was in compliance with prevailing legal requirements.

Lastly, site defendants argue that their original responsive pleadings "reserve[ ] the right to assert additional defenses that may arise in the course of discovery or at trial."

 "[P]rejudice to the non-moving party is the touchstone for the denial of an amendment." *Heyl & Patterson,* 663 F.2d at 425 (*quoting Cornell & Co., Inc. v. Occupational Safety & Health Review Comm'n,* 573 F.2d 820, 823 (3d Cir.1978)); *see Lorenz v. CSX Corp.,* 1 F.3d 1406, 1414 (3d Cir.1993). Incidental prejudice is not a sufficient basis for the denial of a proposed amendment. Prejudice becomes undue when a party shows that it would be "unfairly prejudiced" or deprived of the opportunity to present facts or evidence which it would have offered. *Heyl & Patterson,* 663 F.2d at 426. The test for prejudice is whether the non-moving party will be denied "a fair opportunity to defend and offer additional evidence" to address the amendment. *Evans Prods. Co. v. West American Ins. Co.,* 736 F.2d 920, 924 (3d Cir.1984) (*quoting Universe Tankships, Inc. v. United States,* 528 F.2d 73, 76 (3d Cir.1975)). If the amendment would substantially change the theory on which the action is proceeding, and is proposed so late that a party must engage in significant new preparation, it may be found to be prejudicial. *Elf Atochem,* 161 F.R.D. at 301 (defense that EPA was arbitrary and capricious in remedy chosen one year after filing of complaint and after fact discovery closed was untimely and prejudicial in that it was obvious from start of litigation and trial was close). Courts have denied amendment of pleadings immediately before trial. *See, e.g., Harrison Beverage Co. v. Dribeck Importers, Inc.,* 133 F.R.D. 463, 468 (D.N.J.1990). However, in the instance where no trial date is scheduled,

less prejudice to the non-moving party will be deemed to exist.

Here, no trial date has been set. If the amendment is to be applied retroactively, I may permit the parties to do limited discovery, if warranted, on any new issues raised by the new legislation. For that reason, no party will be prejudiced and the argument fails.

*Futility*

 Futility exists "where the proposed amendment is 1) frivolous or 2) advances a claim that is legally insufficient on its face." "If a proposed amendment is not clearly futile, then denial of leave to amend is improper." This analysis "does not require the parties to engage in the equivalent of substantive motion practice upon the proposed new claim or defense; this does require, however, that the newly asserted defense appear to be sufficiently well-grounded in fact or law that is not a frivolous pursuit." *Harrison Beverage,* 133 F.R.D. at 468.

Plaintiffs argue that site defendants' proposed amendment is frivolous in that 1) it is not to be applied retroactively to pending cases and 2) that even if it was retroactive, the amendment would not apply to the activities performed by site defendants in regards to the Site. Site defendants argue that the proposed amendment is retroactive to this pending action. They also argue that it would not be futile because their actions fall within the type of recycling activities intended by Congress to be exempted from CERCLA liability. The first questions before me are whether the Act applies to this action and what is its temporal reach.

*CERCLA Liability and Section 127*

Under CERCLA § 107(a), four categories of persons may be held liable:

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at

which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances [7], and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which caused the incurrence of response costs, of a hazardous substance, shall be liable for ——

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

(D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

42 U.S.C. § 9607(a); *see New Jersey Turnpike Auth. v. PPG Indus., Inc.*, 197 F.3d 96, 103 (3d Cir.1999). Prior to the enactment of Section 127, defenses to Section 107 liability were more limited. *F.P. Woll & Co. v. Fifth & Mitchell St. Corp.*, 1999 WL 79059, at *3 (E.D.Pa. Feb.4, 1999). A party generally escaped liability only if it showed that the release or threatened release was caused only by one or more of the following: 1) act of God; 2) act of war; or 3) the act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant. 42 U.S.C. § 9607(b). "Certain other limited defenses exist.[8] With the enactment of Section 127, a new defense was added to relieve certain persons qualifying as recyclers from liability under sections 107(a)(3), arranger liability, and 107(a)(4), transporter liability." [9] Section 127(a)(1). Congress set forth the purposes of this legislation:

---

7. CERCLA § 9601(29) defines "disposal" and "treatment" by reference to the definition of the terms as found in section 1004 of the Solid Waste Disposal Act, ("SWDA") 42 U.S.C. § 6903. The SWDA defines "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment." 42 U.S.C. § 6903(3). The SWDA defines "treatment" as "any method, technique, or process ... designed to change the ... character or composition of any hazardous waste so as to neutralize such waste or so as to render such waste nonhazardous ...." 42 U.S.C. § 6903(34). Solid waste is defined as "any garbage, refuse, sludge ... and other discarded material". 42 U.S.C. § 6903(27).

In *United States v. ILCO, Inc.*, 996 F.2d 1126 (11th Cir.1993), the court decided the question of whether lead parts reclaimed from spent batteries for recycling purposes were exempt from regulation under RCRA. The court concluded that the lead falls within the law governing the storage, disposal and treatment of hazardous waste. 996 F.2d at 1130.

8. Other defenses include the innocent purchaser defense, Section 101(35); security interest holders defense, Section 101(20)(A); common carrier exclusion, Section 101(20)(B); application of pesticides done pursuant to FIFRA, Section 107(i); and those whose releases were federally permitted, Section 101(10).

9. SEC. 127 RECYCLING TRANSACTIONS.
 a. LIABILITY CLARIFICATION.
 1. As provided in subsections (b), (c), (d), and (e), a person who arranged for recy-

(1) to promote the reuse and recycling of scrap material in furtherance of the goals of waste minimization and natural resource conservation while protecting human health and the environment;

(2) to create greater equity in the statutory treatment of recycle versus virgin materials; and

(3) to remove the disincentives and impediments to recycling created as an unintended consequence of the 1980 Superfund liability provisions.

S.1948, § 6001(a), Nov. 29, 1999, 113 Stat. 1536, 1537. Congress intended to correct unintended consequences of CERCLA that discourage legitimate recycling by equalizing the differential between recycled and virgin materials. "Virgin materials are in direct competition with recyclables and this legislation will help to increase recycling in our nation." 145 Cong. Rec. S14986–03, S15028. Congress also acknowledged that recycling transactions are distinct from the disposal or treatment of hazardous substances and should not be treated as arranging for disposal or treatment.[10]

Under Section 127, recyclers of certain recyclable materials are exempt from CERCLA liability. "Recyclable materials" are defined as:

scrap paper, scrap plastic, scrap glass, scrap textiles, scrap rubber (other than whole tires), scrap metal, or spent lead-acid, spent nickel-cadmium, and other spent batteries, as well as minor amounts of material incident to or adhering to the scrap material as a result of its normal and customary use prior to becoming scrap . . . .

§ 127(b). Whether a transaction qualifies depends on the type of recyclable material. Scrap paper, plastic, glass, textiles, or rubber are covered under § 127(c), scrap metal under 127(d), and batteries under § 127(e). To qualify for the exemption, the burden falls on the arranger to show that the statutory criteria are met. §§ 127(c)—(e).[11] The exemption does not apply if:

cling of recyclable material shall not be liable under sections 107(a)(3) or section 107(a)(4) with respect to such material. Section 127(a)(1).

10. These exemptions are provided in Sections 127(b)—(e), and exclusions from these exemptions are set forth in Section 127(f). Persons who arranged for recycling under 127(b)—(e), may still be held liable under CERCLA 107(a)(3) or 107(a)(4) if the party filing an action shows that they fall within one of the exclusions of Section 127(f).

11. The two sections at issue here are Sections 127(d) and (e), which address transactions involving scrap metal and batteries which applies to the "scrap battery" and "dirty mercury" transactions in this action. As Section 127 pertains to batteries, "recyclable material" includes spent lead-acid, nickel-cadmium and other types of batteries, and in some cases, such batteries are "arrangements for recycling" and exempt from CERCLA. Transactions involving scrap metal are covered in Section 127(d), which provides that,

(1) Transactions involving scrap metal shall be deemed to be arranging for recycling if the person who arranged for the transaction (by selling recyclable material or otherwise arranging for the recycling of recyclable material) can demonstrate by a preponderance of the evidence that at the time of the transaction—

(A) the person met the criteria set forth in subsection (c) with respect to the scrap metal; [11]

(B) the person was in compliance with any applicable regulations or standards regarding the storage, transport, management, or other activities associated with the recycling of scrap metal that the Administrator promulgates under the Solid Waste Disposal Act subsequent to the enactment of this section and with regard to transactions occurring after the effective date of such regulations or standards,[11] and

(C) the person did not melt the scrap metal prior to the transaction.

(2) For purposes of paragraph (1)(C), melting of scrap metal does not include the thermal separation of 2 or more materials due to differences in their melting points (referred to as 'sweating').

(3) For purposes of this subsection, the term 'scrap metal' means bits and pieces of metal parts (e.g., bars, turnings, rods, sheets, wire) or metal pieces that may be combined together with bolts or soldering (e.g., radiators, scrap automobiles, rail-

(A) the person had an objectively reasonable basis to believe that the time of the recycling transaction—

(i) that the recyclable material would not be recycled;

(ii) that the recyclable material would be burned as fuel, or for energy recovery or incineration; or

(iii) for transactions occurring before 90 days after the date of the enactment of this section, that the consuming facility was not in compliance with a substantive (not procedural or administrative) provision of any Federal, State, or local environmental law or regulation, or compliance order or decree issued pursuant thereto, applicable to the handling, processing, reclamation, or other management activities associated wit the recyclable material;

(B) the person had reason to believe that hazardous substances had been added to the recyclable material for purposes other than processing for recycling; or

(C) the person failed to exercise reasonable care with respect to the management and handling of the recyclable material (including adhering to customary industry practices current at the time of the recycling transaction designed to minimize, through source control, contamination of the recyclable material by hazardous substances) [12].

(2) For purposes of this subsection, an objectively reasonable basis for belief shall be determined using criteria that include (but are not limited to) the size of the person's business, customary industry practices (including customary industry practices current at the time of the recycling transaction designed to minimize, through source control, contamination of the recyclable material by hazardous substances), the price paid in the recycling transaction, and the ability of the person to detect the nature of the consuming facility's operations concerning its handling, processing, reclamation, or

road box cars), which when worn or superfluous can be recycled, except for scrap metals that the Administrator excludes from this definition by regulation.

Section 127(e), "Transactions Involving Batteries", which provides that:

Transactions involving spent lead-acid batteries, spent nickel-cadmium batteries, or other spent batteries shall be deemed to be arranging for recycling if the person who arranged for the transaction (by selling recyclable material or otherwise arranging for the recycling of recyclable material) can demonstrate by a preponderance of the evidence that at the time of the transaction—

1. the person met the criteria set forth in subsection (c) with respect to the spent lead-acid batteries, spent nickel-cadmium batteries, or other spent batteries, but the person did not recover the valuable components of such batteries; [11] and

2. (A) with respect to transactions involving lead-acid batteries, the person was in compliance with applicable Federal environmental regulations or standards, and any amendments thereto, regarding the storage, transport, management, or other activities associated with the recycling of spent lead-acid batteries; [11]

(B) with respect to transactions involving nickel-cadmium batteries, Federal environmental regulations or standards are in effect regarding the storage, transport, management, or other activities associated with the recycling of spent nickel-cadmium batteries, and the person was in compliance with applicable regulations or standards or any amendments thereto; or

(C) with respect to transactions involving other spent batteries, Federal environmental regulations or standards are in effect regarding the storage, transport, management, or other activities associated with the recycling of such batteries, and the person was in compliance with applicable regulations or standards or any amendments thereto.

12. Reasonable care should be judged "based on industry practices and standards at the time of the transaction. Thus, in order to determine if a person failed to exercise reasonable care with respect to the management and handling of the recyclable material, one should look to the usual and customary management and handling practices in the industry at the time of the transaction." Cong. Rec. S.1528, Nov. 19, 1999.

other management activities associated with the recyclable material.

(3) For purposes of this subsection, a requirement to obtain a permit applicable to the handling, processing, reclamation, or other management activities associated with recyclable material shall be deemed to be a substantive provision.

Section 127(f).

## Is Section 127 Retroactive?

Section 127's retroactivity has been addressed only by two other courts. In *United States v. Atlas Lederer Co.*, 97 F.Supp.2d 830 (S.D.Ohio 2000), the United States filed suit against Livingston Company under CERCLA § 107(a)(3). Livingston had sold old batteries to the United Scrap Lead Company, intending to recycle the lead contained within. *United States v. Atlas Lederer Co.*, 85 F.Supp.2d 828, 830 (S.D.Oh.2000). Based on Livingston's alleged liability under section 107(a)(3), other parties sought contribution from it, pursuant to CERCLA § 113(f). 97 F.Supp.2d at 831 n. 2. The court held that Section 127 did not apply to "any pending judicial action initiated by the United States prior to" the enactment of the Act and did not "constitute a mere codification of existing case law." 97 F.Supp.2d at 832.[13] The court concluded that the action before it constituted in its entirety "a judicial ac-

tion" commenced by the United States and therefore, the defense did not apply. Therefore, a pending judicial action brought by the United States would encompass any later cross-claims and third-party claims of contribution. 97 F.Supp.2d at 833–34. The court concluded that it would be incorrect to allow the United States to pursue a CERCLA action against some defendants, but preclude them from seeking contribution. "Such a policy would punish the Respondent Group for accepting responsibility and settling with the Government."[14] 97 F.Supp.2d at 833.

In *Department of Toxic Substances Control v. Interstate Non–Ferrous Corp.*, 99 F.Supp.2d 1123 (E.D.Cal.2000) (*"Toxic Substances"*), plaintiff State of California commenced a cost recovery action against defendants. On a summary judgment motion, the court concluded that the State is a separate entity from the United States with regard to the intent of the legislation and that the legislation would apply to the action. 99 F.Supp.2d at 1126, 1153. The court analyzed the temporal reach of the statute and concluded that it was not retroactive in that the State did not make a sufficient showing that its rights existent at the time it acted were impaired. Furthermore, the court concluded that Section 127 would not increase liability for past conduct (remediation of the site) or would

13. Courts have held on many occasions that parties that sell junk batteries to battery-breaking companies are liable as arrangers under CERCLA § 107(a)(3). In *Gould Inc. v. A & M Battery & Tire Service*, 933 F.Supp. 431 (M.D.Pa.1996). the court held that batteries sold to a battery recycling facility is an arrangement for disposal or treatment of a hazardous substance. The court further concluded that the sale did not constitute the sale of a useful product because it was not for its original intended purpose. 933 F.Supp. at 436. "[I]f a product has no value for the purpose for which it was manufactured and it contains a hazardous substance, then it is more likely the sale is an 'arrangement' to dispose of the substance ... In the case sub judice, the products at issue were spent lead acid batteries... the record does not indicate the batteries ... could supply electric current. Rather,

the batteries only had value because of the lead they contained. Instead of dealing in a 'useful' product, Defendants essentially trafficked in a hazardous substance." 933 F.Supp. at 436 (*quoting Chatham Steel Corp. v. C. Brown*, 858 F.Supp. 1130 (N.D.Fla. 1994)). Furthermore, purposeful ignorance of the activities occurring at the company to which a defendant sells the batteries to is not a defense. 933 F.Supp. at 437.

14. Site defendants contend that plaintiffs' reliance on the *Atlas Lederer* line of cases is misplaced in that the case addressed was brought by the United States and was therefore covered by the Act, and because this action was brought by private parties, the statute applies.

impose new duties with respect to any transactions already completed. · 99 F.Supp.2d at 1140–41, 1153. The court did find, however, that the legislation was retrospective in that it would be applied to the pending action. 99 F.Supp.2d at 1153.

*Should Section 127 Apply to this Private Party Action?* ·

When a question arises as to the temporal reach of a statute, courts wrestle with two contradictory principles. The first provides that, "a court is to apply the law in effect at the time it renders its decision." *Landgraf v. USI Film Products*, 511 U.S. 244, 263, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (*quoting Bradley v. School Bd. of City of Richmond*, 416 U.S. 696, 711, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974)). The second provides that retroactivity is disfavored in the law, in accordance with " 'fundamental notions óf justice' that has been recognized throughout history." *Eastern Enterprises v. Apfel*, 524 U.S. 498, 532, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (*quoting Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 855, 110 S.Ct.· 1570, 108 L.Ed.2d 842 (1990) (Scalia, J., concurring)); *see Landgraf*, 511 U.S. at 264, 114 S.Ct. 1483. When a statute unambiguously applies to conduct that occurred before the statute's enactment, there is no conflict because the presumption against retroactivity and principle that court should apply the law in effect at the time of its decision. *Toxic Substances*, at 1128.

Statutes applying to pending cases are labeled "retrospective." Not all laws that are applicable· to pending cases are "retroactive." *Toxic Substances*, at 1127.· "[A] retrospective statute is retroactive if it attaches new legal consequences to prior acts so as to justify the presumption against retrospective application." 99 F.Supp.2d at 1127 (*quoting United States v. $814,254.76*, 51 F.3d 207, 210 n. 3 (9th Cir.1995)). "[E]very statute, which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past, must be deemed retrospective...." *Landgraf*, 511 U.S. at 269, 114 S.Ct. 1483 (*quoting Gospel v. Wheeler*, 22 F.Cas. 756 (No. 13,156) (C.C.D.N.H.1814)). Courts "consider[ ] fair notice, reasonable reliance, and settled expectations" when determining if a statute is retroactive. *Landgraf*, 511 U.S. at 270, 114 S.Ct. 1483. Elementary considerations of fairness dictate that legislation not be retroactive so that individuals. have the opportunity to be forewarned as to the law and to act accordingly. 511 U.S. at 265, 114 S.Ct. 1483. The presumption is strong that new legislation is prospective and will not have a retroactive effect unless Congress by its language clearly requires a certain result.[15] 511 U.S. at 264, 289, 114 S.Ct. 1483.

The Supreme Court has defined when statutes should be applied retrospectively. *Landgraf*, 511 U.S. at 280–88, 114 S.Ct. 1483 (statutes should not be applied retrospectively unless Congress has expressly commanded so or by "neces-

---

15. Certain types of legislation· are prohibited. The Ex Post Facto Clause prohibits the retroactive application of penal legislation. The Contracts Clause, Article I, § 610, cl. 1, prohibits States from passing legislation that impairs contractual obligations. Art. I, §§ 9–10 prohibits Bills of Attainder, where legislatures single out disfavored persons and provide for punishment for past conduct. The Takings Clause prevents· government èntities from depriving private persons from vested property rights except when for public use and with just compensation. The Due Process Clause protects interests in fair notice and repose.

*Landgraf*, 511 U.S. at 266, 114 S.Ct. 1483. Absent a constitutional restriction, "the potential unfairness of retroactive civil legislation is not a sufficient reason for a court to fail to give a statute its intended scope." 511 U.S. at 267, 114 S.Ct. 1483. This is because retroactive statutes often serve "entirely benign and legitimate purposes, [ ] to respond to emergencies, to correct mistakes ... or simply to give comprehensive effect to a new law Congress considers salutary." Regardless, Congress must make its intent clear. 511 U.S. at 268, 114 S.Ct. 1483.

sary and unavoidable implication"); *see Lindh v. Murphy*, 521 U.S. 320, 326, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). The Third Circuit follows the Supreme Court's reasoning of *Landgraf* and *Lindh:*

1. First, the court must determine if Congress unambiguously expressed a directive that the statute is retroactive. If so, the inquiry is done.

2. If there is no clear statement from Congress as to the temporal reach of the statute, then the court must apply normal statutory construction rules to determine if Congress intended to apply the statute prospectively only. If no such intent is found, then the inquiry is done.

3. If Congress did not provide an unambiguous directive that the legislation is retroactive or that it should be applied only prospectively, then the court must determine the effect the statute will have. This court must inquire as to whether the statute "impair[s] rights a party possessed when he acted, increase[d] a party's liability for past conduct, or impose[d] new duties with respect to transactions already completed". The court should also determine if the "statute affect[s] only prospective relief, or change[s] procedural rules, or simply allocate[s] jurisdiction among fora."

 a. if no retroactive effect is found, the court should apply statutory construction rules to determine if the statute applies to pending cases.

 b. if the statute has retroactive effect, the statute cannot be applied unless Congress has provided clear intent to apply the statute retrospectively.

*Mathews v. Kidder, Peabody & Co.*, 161 F.3d 156, 161 (3d Cir.1998), *cert. denied*, 526 U.S. 1067, 119 S.Ct. 1460, 143 L.Ed.2d 546 (1999); *see Lindh*, 521 U.S. at 326, 117 S.Ct. 2059; *Landgraf*, 511 U.S. at 280, 114 S.Ct. 1483.

*Applying the Test*

**1. Did Congress provide expressly and unambiguously that Section 127 is retroactive?**

Site defendants argue that the plain meaning of Section 127 is clear in that it applies retroactively. Site defendants contend that if Congress wanted Section 127 to not apply to pending private party and State-initiated actions, it would have stated simply that Section 127 did not apply to all pending actions. Site defendants argue that under the canon of statutory construction "expressio unius established exclusio alterius," the specific carve-out for actions brought by the United States demonstrate congressional intent that the statute applies to all other pending actions.

Plaintiffs argue that Section 127 cannot apply retroactively because it does not contain a clear, unequivocal expression of congressional intent. Plaintiffs contend that the statutory language merely provides that the amendment "shall not effect any ... pending judicial action initiated by the United States prior to the enactment of the section." Plaintiffs argue that Congress's silence on how other types of actions should be addressed does not mean that Section 127 applies in all other situations. Rather, plaintiffs argue that, in *Landgraf*, the Supreme Court concluded that statutory language addressing one situation reflected Congress' inability to resolve all retroactivity issues, intentionally leaving other issues to be resolved by the courts. 511 U.S. at 261, 114 S.Ct. 1483. Plaintiffs further argue that denying retroactivity to a statute in one narrow situation is insufficient to create a negative inference that Congress intended the statute to apply retroactively in all other situations. Plaintiffs argue that believing otherwise would lead to the assumption that Congress indirectly conveyed an important, easily expressed intention rather than using "clear, strong, and imperative" language as required by *Landgraf*.

The temporal reach of the exemption is covered under § 127(i) entitled "Effect on Pending or Concluded Actions". Section 127(i) provides that, "[t]he exemptions provided in this section shall not affect any concluded judicial or administrative action or any pending judicial action initiated by the United States prior to the enactment of this section." Arguably, the inquiry may end here. Section 127 does not state that it applies to all pending actions except those commenced by the United States. Rather, it states that Section 127 does not apply to any concluded administrative or judicial action, or to any pending judicial action commenced by the United States. To find that Section 127 applies to pending actions commenced by a State or private party, the court must infer that Congress intentionally omitted mention of pending cases to which Section 127 does apply, because it intended Section 127 to apply retrospectively to all such cases.

■ This suggests that Congress used a negative inference to express its intent. A "negative inference" may be considered during a retroactivity analysis of Section 127. *Toxic Substances*, at 1130–31; *see United States v. Olin Corp.*, 107 F.3d 1506, 1513 (11th Cir.1997). Although the general rule is that if Congress intended retrospectivity, it would have expressly stated so, the Supreme Court held that "Landgraf 'did not preclude all future use of a negative inference analysis in support of retroactive intent.' " [16] *United States v. Olin*, 107 F.3d at 1513. Therefore, it was not necessary for Congress to state that the Section 127 amendment apply to all pending actions except those initiated by the United States or specifically to private party or State-initiated actions. *Toxic Substances*, at 1130.

Based on the plain meaning of the statute, it appears that Congress intended the recycling exemption to apply to State-initiated and private party actions, and only *not* to United States-initiated actions. As plaintiffs argue, if Congress did not want Section 127 to apply to these pending actions, it could have easily provided so by stating simply that, "this legislation does not apply to *any* pending actions." Its choice not to do so is evidence that Congress intended that pending private party and State-initiated actions be covered by Section 127. Although Congress did not mention specifically that Section 127 applies to private party and State-initiated actions, the language of Section 127 appears to permit the exemption to apply to them.

■ However, a court must not find clear intent to apply a statute with retroactive effect by using nothing more than a negative inference. *Mathews*, 161 F.3d at 167. "[A]bsent explicit statutory language mandating retroactivity, laws may be applied retroactively if courts are able to discern 'clear congressional intent favoring such a result.' " *Olin*, 107 F.3d at 1512–13 (*quoting Landgraf*, 511 U.S. at 280, 114 S.Ct. 1483). Therefore, I will proceed to legislative intent.

### 2. Did Congress intend that Section 127 should be applied prospectively?

Plaintiffs argue that the Act should only be applied prospectively. Site defendants argue that it should be applied both prospectively and retrospectively. The second step of the *Landgraf/Lindh* analysis requires me to examine Section 127 under rules of statutory construction for evidence

**16.** In *Mathews,* the court was faced with a negative inference and found that certain amendments were mentioned because of Congress's concern that they would be applied retrospectively in the absence of express language to the contrary because they were procedural. The court concluded that Congress intended that non-procedural amendments did not require such a statement because un-

der that instance, the statute would not be applied retrospectively after the rules of statutory construction and presumption against retrospective application of new statutes were applied. 161 F.3d at 168. Here, there is no concern that parts of Section 127(i) is procedural and others are not. This could not have been the concern of Congress.

of Congress's intent to apply the statute prospectively only.

■ Various theories of statutory interpretation have been used by courts to determine the meaning of a statute.[17] Generally, the Supreme Court, with some influence from Justice Scalia, has held that when determining the meaning of a statute, a court should apply textualism and begin with the statutory language. *Holder v. Hall*, 512 U.S. 874, 914, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994); *see Landgraf*, 511 U.S. at 287, 114 S.Ct. 1483 (Scalia, J., concurring). The "'authoritative source' for legislative intent [is generally] the text of the statute passed by both Houses of Congress and presented to the President, not a series of partisan statements about purposes and objectives collective by congressional staffers and packaged into a committee report. 'We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.'" *Holder*, 512 U.S. at 891, 114 S.Ct. 2581 (*quoting Connecticut National Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992)) (Thomas, J. and Scalia, J., concurring); *see Landgraf*, 511 U.S. at 287, 114 S.Ct. 1483 (Scalia, J. concurring). However, when the statutory language is indecipherable, as in the case of textual ambiguity, the court should turn "to the legislative purpose as revealed by the history of the statute, for such light as it may shed." *Concrete Pipe and Prods. of California, Inc. v. Construction Laborers Pension Trust for Southern California*, 508 U.S. 602, 627, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993); *see Toibb v. Radloff*, 501 U.S. 157, 162, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991); *Landgraf*, 511 U.S. at 289, 114 S.Ct. 1483 (Scalia, J., concurring) (if a statute is unclear, the Court must restrict its application to prospective operation). Although on its face, the statute appears retrospective, I will review the legislative history for Congress's intent.

*Legislative History*

Plaintiffs argue that the legislative history for Section 127 is scarce because the legislation was hastily enacted as a rider to the Omnibus Budget Appropriations Act of 1999 (H.R.3194). Plaintiffs contend that the history that exists is conflicting and does not support the argument that the Act should be retroactive. Site defendants argue that, although the Act was hastily enacted without legislative history, congressional discussions and bill proposals were ongoing since 1994 by the 103rd Congress in the form of the Superfund Reform Bill of 1994, and that the history, including that of the recent enactment, support retroactivity. Site defendants argue that the previous legislative history, which includes multiple committee statements, demonstrates Congress' intent that Section 127 apply retroactively to pending actions between private parties.

It was apparent to Congress after CERCLA's enactment that unintended liability was being imposed on legitimate recyclers. In 1994, a bill was proposed which, if enacted, would have exempted recycling transactions from CERCLA lia-

---

**17.** For example, there are 1) originalist sources of the plain meaning of statutory text and structure, legislative history and purpose and 2) those of dynamic statutory interpretation, which includes a) an intentionalist approach, which "seeks to ascertain the intent of Congress in enacting the statute"; b) a "purposive approach," which "pursues an interpretation that is consistent with the purposes of the statute"; and c) a "textualist approach" which "interprets the statute according to the meaning of the statutory language alone." John Nagle, *Newt Gingrich, Dynamic Statutory Interpreter*, 143 *U. Pa. L.Rev.* 2209, 2211, 2215 (1995). Such interpretation relies on contextual constraints to perform statutory interpretation even when the statute is ambiguous. The contexts include authorities such as dictionaries and case law in existence at the time the legislature enacted the statute, the statutory text, canons including the clear statement rule, which permit construction without looking to the statutory purpose or legislative history. 143 *U. Pa. L.Rev.* at 2211, 2215.

bility. H.R. 4916, 103rd Cong. (1994). The bill was "developed in conjunction with the recycling industry, the environmental community and the Federal Government." 141 Cong. Rec. E269–05 (daily ed. Feb. 3, 1995) (statement of Rep. Lincoln). It had significant legislative history including five reports from Congressional committees which recommended passage.[18] Two reports endorsed the bills' retroactive application to past transactions and pending private-party actions. The report from the Committee on Energy and Commerce provided that, "[t]he relief from liability provided by [the] section [on recycling transactions] is for both retroactive and prospective transactions that meet all the other applicable criteria . . . ." H.R. Rep. No. 103–582(I), 1994 WL 320916, at *145 (Committee on Energy and Commerce). The report from the Committee on Public Works and Transportation stated that the recycling bill "provides for relief from liability for both retroactive and prospective transaction." H. Rep. No. 103–582(II), 1994 WL 422720, at *138 (Committee on Public Works and Transportation).

Members of the Senate Committee argued that the bill should be applied to pending private-party actions: "We believe that those parties who took batteries or used motor oil to legitimate recyclers should be exempt from Superfund liability in the past as well as the future." S.Rep. No. 103–349, 1994 WL 454563, at *132 (statement of Senators Simpson, Smith, Faircloth, and Kempthorne, collectively). The 103rd Senate Report on the Superfund Reform Bill for 1994 similarly endorsed its application to past transactions:

"The provisions . . . are intended to permit a person to be exempt for past recycling transactions if there was no objectively reasonable basis for the person to know or suspect that the consuming facility was not in compliance [with applicable regulations]". S. Rep. 103–349, 1994 WL 454563, at *64 (Committee on Environment and Public Works).

H.R. 4916 was not enacted but, in 1998, another attempt to enact a recycling exemption was made. 105th Cong. (1998). Much of the language of the "Superfund Recycling Equity Act of 1998" S. 2180 was taken from H.R. 4916. S. 2180, 105th Cong. (1998). S. 2180 contained the exact provision regarding temporal reach as contained in enacted Section 127. This legislation also failed.

With the framework having been shaped, it is possible that Congress concluded that additional new legislative history was not necessary when it finally enacted Section 127 in 1999. The bill was significantly similar to its predecessors. This is likely the reason why there were no conference or committee reports or hearing transcripts. For significant new environmental legislation, it would be improper not to have thorough discussion.[19]

The legislative history includes three co-sponsor statements:

*Senator Lott*

Senator Lott's statement provides in relevant part that,

CERCLA § 127[ ] clarifies liability for recycling transactions . . . § 127 pro-

---

18. Site Defendants set forth the following five committee reports: S.Rep. No. 103–349 (1994) (Committee on Environment and Public Works); S.Rep. No. 103–389 (1994) (Committee on Finance); H.R.Rep. No. 103–582(I) (1994) (Committee on Energy and Commerce, recommending passage of H.R. 3800); H.R.Rep. No. 103–582(II) (1994) (Committee on Public Works and Transportation); H.R.Rep. No. 103–582(III) (1994) (Ways and Means Committee).

19. Congress often inserts riders into annual appropriation bills that have little to do with the appropriations. In 1998, the Superfund Recycling Equity Act of 1998, a similar exemption for recyclers was almost enacted as rider to the omnibus appropriations bill for 1999. Such procedure "creates a kind of stealth legislative process that is inappropriate for reform of environmental law." Adam Babich, *Dodging a Bullet: Lessons from the Failed Hazardous Substance Recycling Rider to the Omnibus Appropriations Bill*, 29 *Envtl. L. Rep.* 10139 (Mar.1999).

vides for relief from liability for both retroactive and prospective transactions ... Congress clearly intends that the exemptions from liability granted by § 127 shall not affect any concluded judicial or administrative action. Concluded action means any lawsuit in which a final judgment has been entered or any administrative action, which has been resolved by consent decree, which has been filed in a court of law and approved by such court. Furthermore, § 127 shall not affect any pending judicial action brought by the United States prior to enactment of this section. Any pending judicial action, whether it was brought in a trial or appellate court, by a private party shall be subject to the grant of relief from liability. For purposes of this section, Congress intends that any third party action or joinder of defendants brought by a private party shall be considered a private party action, regardless of whether or not the original lawsuit was brought by the United States. Additionally, any administrative action brought by any governmental agency but not yet concluded as set forth above, shall be subject to the grant of relief from liability set forth in this § 127.

145 Cong. Rec. S15048–15050 (daily ed. Nov. 19, 1999) (Statement of Senator Lott).

### Senator Lincoln

Senator Lincoln's statement provides that,

Mr. President, we have been working to right this wrong [to the recycling industry by removing bias against recycled materials] for over six years. During the 103d Congress, I first introduced a bill to relieve legitimate recyclers of scrap metal from unintended Superfund liability. The bill was developed in conjunction with the recycling industry, the environmental community, and the Administration. We worked closely together and consistently agreed that liability relief for recyclers is necessary and right. The language in this bill is

the culmination of a process that we have been working on since 1993 ... as the sponsoring member of this legislation when I was a member of the House of Representatives, I would like to make a couple of important points. First, this Superfund Recycling Equity Act is both retroactive and prospective. Slightly different standards must be met for recyclers to be relieved of Superfund liability for recycling transactions that occurred prior to the date of enactment than for those that occur after the date of enactment... Only lawsuits brought prior to enactment of this legislation directly by the United States government against a person will remain viable. All other lawsuits brought by private parties, or against third party defendants in lawsuits originally brought by the U.S. Government will no longer process under this legislation ....

145 Cong. Rec. S. 14896–03, S15028, 1999 WL 1050353, (daily ed. Nov. 19, 1999) (statement of Senator. Lincoln).

### Senator Daschle

Senator Daschle issued a statement into the Congressional Record on January 26, 2000 to

correct an inadvertent but significant error in the Congressional Record of November 19, 1999 ... by Senator Lott (145 Congressional Record S15048) regarding the Superfund Recycling Equity Act ... [t]he statement erroneously was attributed to both Senator Lott and me. [T]he statement did not then and does not now reflect my understanding of the Superfund recycling amendments. I make this clarification at the earliest opportunity, in order to minimize the possibility of any mistake and reliance on the statement as the consensus view of two original co-sponsors, particularly with respect to the availability of relief in pending cases ... there is no conference report, and there are no committee reports or hearing transcripts, to guide

interpretation of the bill ... However, much, though not all, of the language in the recycling amendments originated in the 103d Congress. At that time, key stakeholders, including EPA, members of the environmental community and the recycling industry, agreed on recycling provisions as part of efforts to pass a comprehensive Superfund reform bill. Although Superfund reform legislation did not reach the floor in the 103d Congress, it was reported by the major Committees of jurisdiction in both the Senate (S.1834) and the House with bipartisan support. In reporting these bills in the 103d Congress, the Senate Environment and Public Works Committee, the House Energy and Commerce Committee, and the House Public Works and Transportation Committee each produced reports that include discussions of the recycling provisions.

Since the recycling provisions of S.1834 were identical in most respects to the Superfund Recycling Equity Act of 1999, and the meaning of key provisions of that bill were actively considered and discussed, the Senate Committee Report contains probably the best description of the consensus on the meaning of those provisions.

To the extent the Committee Report does not address a particular provision of the recycling amendments, the Committee may very well have chosen to be silent on the point. With respect to such provisions, the 'plain language' of the statute must be our guide ... it will be for the courts to resolve questions of interpretation on a case-by-case basis. Cong. Rec. at S76–02, S76–77 (Jan. 26, 2000 daily ed.), 2000 WL 64661 (2000) (statement of Senator Daschle).

▮▮▮▮▮ "[S]tatements by individual legislators should not be given controlling effect, but when they are consistent with the statutory language and other legislative history, they provide evidence of Congress' intent." *Brock v. Pierce County*, 476 U.S. 253, 263, 106 S.Ct. 1834, 90

L.Ed.2d 248 (1986). Moreover, a court may consider the statements of a cosponsor or committee representative when performing statutory construction if after careful evaluation, it is convinced that the sponsor is knowledgeable about the bill and not sacrificing candor to partisan interests. Southerland, *Statutory Construction*, Vol. 2A, § 48.15, p. 364. Moreover, statements made after the enactment of the legislation carry less weight than those made earlier.

Based on the review of the legislative history, it is clear that Congress did not intend that the Act only apply prospectively to State-initiated and private party actions. Senators Lott and Lincoln, co-sponsors of the bill, expressly stated that the recycling exemption should apply retroactively and prospectively to private parties. Senator Daschle's statement raises concern because it was made after the legislation's enactment and because it is somewhat ambiguous. He states that he does not agree with Senator Lott regarding "relief in pending cases". He does not clarify what he means. Furthermore, Senator Daschle contends that no legislative history exists to support Section 127. However, he states that Section 127 was nearly unchanged from the prior proposed 1998 bill. The 1994 bill was significantly the same as the 1998 bill and did have legislative history, including Committee reports, some of which addressed the retroactivity question and concluded that the recycling exemption should be retroactive and prospective. I do not find his statement helpful to the determination of whether Section 127 is retroactive or retrospective. Rather, I find it ambiguous. I also do not find any partisan interest here. Senator Lott is Republican from Mississippi, and his testimony agrees with that of Senator Lincoln, a Democrat from Arkansas. Senator Daschle is a Democrat from South Dakota.

After reviewing the plain language of the Act, I do not conclude that Congress intended this Act to only apply prospectively. Nor do I conclude that the legisla-

tive history expresses any intent of Congress to apply Section 127 only to new cases.

### 3. Does Section 127 have a retroactive effect?

Plaintiffs argue that Section 127 is not retroactive to this pending private party action. Plaintiffs do not specifically argue that their rights will be impaired because Section 127 would eliminate a cause of action. Rather, plaintiffs argue that "because of basic notions of fairness and the belief that the law should not disrupt settled expectations, there is a strong presumption against retroactive application of any law that cannot be overcome without a clear statement by Congress that the law should have such an effect." Site defendants argue that Congress intended Section 127 to apply retroactively to pending contribution actions. Site defendants further argue that because CERCLA is retroactive it follows that Section 127, a defense to its liability, should also be.

▆▆▆▆ A statute is retroactive if it "'would impair rights a party possessed when [the party] acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." Landgraf, 511 U.S. at 280, 114 S.Ct. 1483 (statute has retroactive effect if it "attaches new legal consequences to events completed before its enactment"). In its consideration, a court must determine if retroactive application "results in 'manifest injustice'" Toxic Substances, at 1140. However, "[a] statute is not retroactive [merely] because it applies to transactions that precede the statute's enactment or 'upsets expectations based on prior law.'" 99 F.Supp.2d at 1140 (quoting Landgraf, 511 U.S. at 269, 114 S.Ct. 1483). To qualify as retroactive by "upset[ting] settled expectations, [Congress] must do so unequivocally and in a way that assures us that it has seriously considered the consequences of such action." Mathews, 161 F.3d at 170. "[C]lear congressional intent is required to apply a

statute retrospectively if doing so 'altered the extent of a party's liability.'" 161 F.3d at 164 (quoting Armbruster v. Unisys Corp., 32 F.3d 768, 771 n. 3 (3d Cir.1994)). For example, depriving a defendant of a defense or a plaintiff of a claim constitutes a retroactive affect, affecting the substantive rights of the parties. Mathews, 161 F.3d at 166. Although retroactivity may not be expressly provided for by a statute, the statute may be applied retroactively if a court can conclude that congressional intent favors such a retroactive effect. Landgraf, 511 U.S. at 280, 114 S.Ct. 1483; Olin Corp., 107 F.3d at 1512–13.

In Toxic Substances, the court concluded that, "recyclers who can satisfy the requirements of Section 127 should not have been liable under the pre–127 law, and are not proper sources of recovery." Toxic Substances, at 1140. The court held that Section 127 did not impair the rights any party had when it acted. The court concluded that plaintiffs did not set forth any way in which section 127 would impose more costs or expense on them in regards to the remediation of the site. The court also concluded that because the application of Section 127 did not make any difference to a party's conduct, it was not retroactive. 99 F.Supp.2d at 1140; see Bradley, 416 U.S. at 721, 94 S.Ct. 2006. The court observed that plaintiff did not argue that it had a vested expectation or that it undertook any conduct in reliance on section 127 that it would not have taken if Section 127 had been enacted. Rather, plaintiff argued that the amendment potentially eliminated a pre-enactment cause of action that existed and that it would be deprived of the right to seek recovery against a specific class of parties. Toxic Substances, at 1140. The court found no merit in this claim, holding that legitimate recyclers should not have been found liable under CERCLA even before the enactment of Section 127.

I agree, in part, with Toxic Substances in that permitting the retroactivity of this Section 127 recycling defense does not

present a retroactivity problem. No rights that plaintiffs possessed at the time that they acted—namely, their actions surrounding the contamination of the Site—are being impaired. Plaintiffs were held liable for the contamination at the Site, and Section 127 does not alter their remediation costs. This liability is not be increased by Section 127. Any rights that plaintiffs believed that they had at the time they acted were addressed by CERCLA and the Superfund Amendments and Reauthorization Act of 1986 ("SARA") and resulted in their liability. The same would apply to site defendants if they are found liable for contribution. It follows that Section 127's recycling exemption must be applied retroactively as well. If Congress were to hold someone liable for CERCLA liability, they should now be able to argue this recycling defense. The text and purpose of CERCLA and extensive comments by legislators indicated Congress's expectation that CERCLA would be applied retrospectively to pending actions commenced by other parties than the United States. *Mathews*, 161 F.3d at 170. As discussed earlier, it is possible that site defendants would not have been held liable without the recycling defense. Prior case law has held in many cases that CERCLA liability should not be imposed on legitimate recyclers. As noted, however, the case law was not always consistent.

Similarly, Section 127 does not automatically exempt site defendants from any liability. Rather, site defendants must show that they are entitled to prevail on the exemption. Even if site defendants prevail on their recycling exemption, plaintiffs will need to prove their claims against the remaining defendants. I cannot conclude that plaintiffs automatically lose a cause of action for contribution. Whether plaintiffs will prevail on their Sections 107 and 113 claims is yet to be determined. Nor do I find that there are new duties imposed on any party. Based on this, I cannot conclude that any rights have been impaired or new duties imposed or that liability has been increased based on the imposition of the recycling exemption alone.

I am concerned, however, that at this advanced stage of this litigation that plaintiffs' may be penalized by the fee-shifting provision contained within Section 127(j). Taking away the right to certain damages or creating a right to new damages, e.g., compensatory and punitives, where they did not exist "can be seen as creating a new cause of action, and its impact on parties' rights is especially pronounced." *Mathews*, 161 F.3d at 165 (*quoting Landgraf*, 511 U.S. at 282–83, 114 S.Ct. 1483); *see Landgraf*, 511 U.S. at 281, 114 S.Ct. 1483(imposition of punitive damages provision would present ex post facto problems). Such a change is the kind of "legal change that would have an impact on private parties' planning." *Landgraf*, 511 U.S. at 282–83, 114 S.Ct. 1483. This would be the type of provision that should not apply to events occurring before its enactment "in the absence of clear congressional intent." 511 U.S. at 283, 114 S.Ct. 1483.

The fee-shifting provision was not in existence at the commencement of the action, nor during discovery, at which times, plaintiffs could have assessed their claims against site defendants more fully with concern for the possibility of proceeding wrongfully against legitimate recyclers. Although prior case law has often not found liability when legitimate recycling activities were undertaken, the law does not appear to have been clearly established that recyclers would not be liable.[20] I

---

**20.** In *Toxic Substances,* the court also noted that prior case law regarding recyclers at time found them not liable under the "useful product analogy" and other theories. 99 F.Supp.2d at 1144–45; *see Prudential Ins. Co. v. United States Gypsum,* 711 F.Supp. 1244, 1254 (D.N.J.1989) (no liability exists when products containing hazardous substance were part of a sale of a substance to be used in the construction of a building, rather than "an affirmative act to get rid of the [material] beyond the sale of it as part of a complete, useful product"); *South Florida,* 84 F.3d at 406–07 (11th Cir.1996) (chemicals in question

cannot conclude that plaintiffs here could have relied on prior case law to the extent that they would have been forewarned that possible recyclers would not be contribution candidates and should be penalized with the fee-shifting provision. However, Section 127(j) provides that, "any person who commences an action in contribution against a person who is not liable by operation of this section shall be liable to that person for all *reasonable* cost of defending that action, including all reasonable attorney's and expert witness fees". It may be that if this issue is reached in this and other similar pending actions, where there was no notice to the plaintiffs of the fee-shifting provision before the commencement of an action, the court will conclude that the award of any fees is not reasonable. Perhaps this is where the courts should resolve questions surrounding the interpretation of this provision on a case-by-case basis. *See, e.g.,* Cong. Rec. at S76–02, S76–77 (Jan. 26, 2000 daily ed.), 2000 WL 64661 (2000) (statement of Senator Daschle).

 Another argument in favor of retroactivity is that Section 127 provides different standards to those who acted before its enactment and those that acted after. Section 127(c)(5) provides that,

> For transactions occurring 90 days or more after the date of enactment of this section, the person exercised reasonable care to determine that the facility where the recyclable material was handled, processed, reclaimed, or otherwise managed by another person (hereinafter in

this section referred to as a 'consuming facility') was in compliance with substantive (not procedural or administrative) provisions of any Federal, State, or local environmental law or regulation, or compliance order or decree issued pursuant thereto, applicable to the handling, processing, reclamation, storage, or other management activities associated with recyclable material.

That Congress provided for two separate standards also argues for the application of Section 127 retroactively. Based on the foregoing, I agree with the Toxic Substances court that Section 127 should be applied retroactively to State-initiated actions. I also conclude that subsequent private party contribution actions are also covered by Section 127. I am satisfied that Congress intended this result.

4. *If Section 127 is retroactive, did Congress provide so expressly and unambiguously?*

 Because Section 127 has retroactive affect, Congress must have provided the clear intent to apply the new provision retrospectively. To determine if Section 127 should apply to pending cases, the court must look at the statute's text, purpose, and legislative history.[21] *Mathews,* 161 F.3d at 166. The Court has done this and concludes that the text, purpose and legislative history support the determination that Section 127 should be applied to pending actions between private parties. On first reading of Section 127(i), it was clear that the only pending actions exclud-

had value and were use and their transfer was not disposal). In *Toxic Substances,* the court concluded that based on this, the liability of each alleged recycler should not be different based on the prior case law. Therefore, the court concluded that plaintiffs should not have other expectations and cannot say that they relied on pre-enactment law. *Toxic Substances,* at 1154. As stated in the main text. I respectfully cannot agree on this point with the Toxic Substances court.

21. It is not likely that Congress would rely on a policy that it does not state in the legislation to advise the courts that a statute should be

applied to pending cases. *Mathews,* 161 F.3d at 169. Rather, it should provide an express command of its policy goal. Here, Congress has set forth its goal in regarding to Section 127. However, "even when 'retroactive application of a new statute would vindicate its purpose more fully ... [this alone] is not sufficient to rebut the presumption against retroactively'". 161 F.3d at 169 (*quoting Landgraf,* 511 U.S. at 285–86, 114 S.Ct. 1483). However, as I have concluded, the text and legislative history also confirm that the recycling exemption should apply retrospectively.

ed from the statute were those that were initiated by the United States. Legitimate recyclers should not be held liable. The legislative history for this specific bill—although supported by a few cosponsor statements—leans strongly towards retroactivity. Prior legislative history also supports this determination. Congress provided for retroactivity of Section 127 in a manner that was sufficiently express and unambiguous.

### 5. If Section 127 is retrospective?

 Generally, a controversy must be decided on the law that exists at the time the trial court decides the matter. *State of N.J. Dep't of Env. Protection v. Gloucester Env. Mgt. Srvs.*, 719 F.Supp. 325, 333 (D.N.J.1989). There are exceptions to the rule in that sometimes, retrospective application of a new law has unjust consequences. There are three requisites for applying a decision only prospectively:

— The holding must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed;

— The merits and demerits in each case must be weighed by looking to the history of the rule, its purpose and effect, and whether retrospective operation will further or retard the rule's operation; [and]

— Retrospective application must create the risk of producing substantially inequitable results.

*Gloucester Env. Mgt. Srvs.*, 719 F.Supp. at 334 (*quoting Hill v. Equitable Trust Co.*, 851 F.2d 691, 696 (3d Cir.1988)); *see Chevron Oil Co. v. Huson*, 404 U.S. 97, 106–07, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971).

 Section 127 clarifies CERCLA liability in regards to recyclers. It is entitled

a "clarification" of prior law.[22] Congress uses this terminology when it intends to show how the legislation was intended to originally operate. I do not conclude that Section 127 is intended to change the law, but rather to clarify it. The retroactivity of Section 127 will only further Congress's goals of site remediation and increasing recycling by clearly eliminating CERCLA liability for legitimate recyclers. As CERCLA is retroactive to all pending conduct and actions, and as are its amendments contained in SARA, perhaps so should any defenses, in particular, the recycling exemption before the Court. *United States v. Kramer*, 757 F.Supp. 397, 431 (D.N.J.1991); *see Philadelphia v. Stepan Chemical Co.*, 544 F.Supp. 1135, 1150–51 (E.D.Pa.1982) (sufficient congressional intent was discernible to overcome the judicial presumption against retroactive application of the act). I also do not conclude that the retrospective application of Section 127 will produce substantially inequitable results.

In summary, Section 127 should be applied retrospectively here. The language, purpose, and legislative history of Section 127 support that determination. This determination is not dispositive as a finding for any party. The defendants seeking to add the Section 127 defense must still prove by a preponderance of the evidence that they meet all requirements set forth in this amendment.

*Applicability of Section 127 to transactions involving mercury in liquid or sludge form*

 Plaintiffs argue that even if Section 127 was found to be applicable to pending actions, the defense would be futile because the amendment does not apply to mercury in liquid or sludge form, only to transactions involving "recyclable material." Site defendants argue that the amendment is not futile because, as a de-

---

**22.** Section 127 is entitled "CLARIFICATION OF LIABILITY UNDER CERCLA FOR RECYCLING TRANSACTIONS". "When Congress clarifies a statute, it adds language to show how the law originally was intended to oper-

ate." The Ninth Circuit has stated that when an amendment is a clarification of existing law, rather than a change, it should be used to interpret the provision retroactively. *Toxic Substances*, at 1133.

fense to plaintiffs' claim for contribution, site defendants are not liable under CERCLA for the recovery, reuse, and or refinement of mercury. Site defendants contend that this is not the time to argue the merits of the defense.

I have reviewed the parties' arguments regarding futility of the amendment and conclude that such disposition is proper at trial. I am not confident for the purposes of this motion that I have a full record before me and, therefore, I will not address futility. I am convinced, however, that site defendants have set forth sufficient argument to support their motion to amend.

## CONCLUSION

Based on the foregoing, defendant's motion to amend its Answers to add the recycling defense provided for in CERCLA § 127 is GRANTED.

SO ORDERED.